**FRANK v. TRU-VUE, Inc.**

No. P-656.

District Court, S. D. Illinois, N. D.

April 3, 1946.

Howard L. Doyle, U. S. Atty., and Marks Alexander, Asst. U. S. Attorney, both of Springfield, Ill., and Wm. Richard Stengel,

Asst. U. S. Atty., of Rock Island, Ill., for petitioner.

Sorling & Catron, by Lacey Catron, all of Springfield, Ill., for respondent.

ADAIR, District Judge.

Findings of Fact

1. The petitioner is a citizen of the United States and a resident of the State of New York, and resides at 37 West 43rd Street, New York City, New York.

2. The respondent is a corporation and maintains a place of business at Rock Island, Illinois, which is within the Southern District of Illinois.

3. Beginning sometime in the month of January, 1941, and continuing until on or about April 20, 1942, petitioner was acting as a salesman of respondent's products and performing the duties as such salesman in New York and other Eastern states, under a contract with respondent company, with the terms and conditions of work, as follows:

(a) Petitioner's work as salesman consisted of soliciting orders from retail establishments for Tru-Vues, a specialty article in the nature of a stereoscope, and films for same, in Greater New York City and certain Eastern states.

(b) Under said contract, petitioner was also the "Community Sales Representative" of respondent's products in Greater New York, and under this plan petitioner purchased respondent's products and resold them to customers of his own choosing.

(c) Petitioner was paid by respondent on a commission basis, a percentage of the wholesale price of the products sold, which percentage varied with the discount allowed to the retail establishment in accordance with the terms of the letter from respondent company in evidence as Petitioner's Exhibit 1, as follows:

"On sales where you give 33⅓% discount your commission will be 20%.

"On sales where you give 40% or 40-5 discount, your commission will be 15%.

"On sales where you give 40-10 discount, your commission will be 12½%.

"Your commission on the 40 and 40-5 is the same, and we expect you to use your own best judgment in each instance. We will settle with you on commissions from this office."

In the Spring of 1941, petitioner's commission on 40% discount sales was increased to 20% as a result of negotiation between the parties.

(d) It was agreed and expected by the parties that petitioner would use his own judgment in the granting of discounts but that same would be granted generally in accordance with the quantity of the order or the size of the account, as set forth in said letter, Petitioner's Exhibit 1.

(e) All orders were to be solicited on open account and orders were to be subject to refusal by the respondent on the ground of poor credit of the customer.

(f) It was assumed by both parties to the contract that deliveries were to be made by petitioner, but this arrangement was later changed in accordance with the demand of the petitioner.

(g) Petitioner was paid commissions on all accounts sold in his New York territory (except at the beginning several old accounts were reserved by the company and were later turned over to petitioner), including all repeat orders, regardless of whether such sales were the result of petitioner's solicitation.

(h) At the specific request of petitioner, his sales territory was enlarged from time to time under the contract to include Massachusetts, Connecticut, Rhode Island, most of Pennsylvania and the cities, Washington, D. C., and Baltimore, Maryland.

(i) Within the territory agreed upon from time to time between petitioner and respondent, petitioner was free to solicit orders in whatever time and manner he chose and from whatever customers he selected; he determined his own hours and places of work, his own schedules, sales routes and itineraries and employed whatever methods of salesmanship he desired; the contract did not require petitioner to spend full time or any particular time in such sales work and did not prohibit petitioner from simultaneously selling other articles manufactured by other companies or from doing any other work for other persons at any time.

(j) No sales quota was imposed on petitioner by the contract and respondent company did not control or direct petitioner in regard to what customers he should solicit or as to the time, place or manner of soliciting orders.

(k) Petitioner paid all of his own expenses incurred in the making of sales or solicitation of orders, including office expenses and travel expenses, although in one

instance respondent company made a gift of $75 to petitioner because of the expenses he had already incurred in making a non-sales trip to Rock Island (totaling $125) and in giving out a large number of samples; petitioner furnished all samples given by him to customers and also owned and kept, from time to time, a large stock of respondent's products at his own risk.

(1) Petitioner maintained an office (jointly with others) in New York City and paid expenses for same, including telephone, stationery and secretarial help; his stationery bore the heading "George Frank, 50 East 42nd Street, New York City," at the top, and at the left, the words "Tru-Vue, Inc., 3rd Dimension Pictures."

(m) Petitioner considered his contract with the respondent company as giving him a "distributorship" and the terms of said contract were fixed by free negotiation between the parties; later modifications in the arrangement were made by negotiation between the parties and, at all times, petitioner acted as an independent party, dealing with the respondent company on an equal basis; the additions from time to time of several eastern states and cities to petitioner's territory were made at petitioner's insistence and in accordance with the amount of territory he thought he could handle.

(n) In his sales work, petitioner exercised his own discretion as an independent operator and respondent company exercised no direction or control over the manner in which petitioner chose to perform his work. Some examples of petitioner's independent operations are as follows: Shortly after the contract between the parties in January, 1941, petitioner offered to assume 50% of the credit risks on accounts sold by him and also at that time and continuously from then to April 20, 1942, petitioner undertook to collect payment from delinquent accounts to whom he had sold respondent's products; petitioner twice changed the method of delivery of respondent's products to the retail accounts in New York City in accordance with his own convenience or for the convenience of his accounts; petitioner utilized his discount privileges as "Community Sales Representative" to purchase a large stock of respondent's products, deliver them personally to retail accounts in New York City and then obtained both his regular commission on such sales to retail accounts and also credit against his purchases as a Community Sales Representative, although this method of operation was a substantial detriment to and hardship on respondent company.

(o) The relationship between respondent and petitioner was that of independent parties working and cooperating for their mutual benefit and advantage and neither party was subservient to the other; respondent company was interested only in results, i.e., sales solicited by petitioner, and indicated frequently to petitioner that he was entirely free in the manner and method he used in soliciting orders and making sales.

(p) Respondent company also frequently indicated to petitioner that he was free to choose any method he desired to stimulate sales and petitioner did, in fact, and without any direction or control by respondent, procure expert testimonial letters from physicians, assist his retail customers in erecting display advertising and in arranging the merchandise for sale in the retail store and, in many other ways, acted on his own initiative to promote orders and sales.

(q) The hiring and firing of demonstrators to work in the retail stores during the Christmas season and the selection of the retail stores that were to have such demonstrators was left to petitioner's discretion, although the demonstrators were employees of respondent company.

(r) Petitioner at all times considered himself an independent operator and his sales work an independent calling; petitioner specifically stated in correspondence with respondent company (Respondent's Exhibit 82) that he was not the "employee" of the company but that the retail accounts he had sold in his territory were "his accounts" which he had obtained at his own expense and by his own independent effort.

(s) Respondent company did not at any time consider petitioner to be an employee of the company and did not include petitioner under its United States Social Security plan, its group insurance plan covering employees, its Workmen's Compensation plan, its Unemployment Compensation plan, or in any other way recognize petitioner as an employee.

4. On or about April 20, 1942, petitioner was inducted into the United States Army and thereafter entered into the military training and service of the United States.

5. Respondent company did not place another salesman in petitioner's territory and since April 20, 1942, to the present time no person has been performing the work formerly performed by petitioner in that territory.

6. Respondent company operates primarily a mail-order business and has continuously followed the practice (when petitioner was acting as salesman as well as since his induction into the Army) of circularizing by mail all of their retail accounts. This was done usually in the late summer or fall in preparation for the Christmas trade for the purpose of supplying merchandise to the retail accounts for their Christmas business in an orderly fashion.

7. Prior to the induction of petitioner into the Army on April 20, 1942, respondent company was experiencing some difficulty in obtaining materials with which to manufacture its products and had followed a policy of accepting no new accounts unless they were of the best kind. Shortly after April 20, 1942, the shortage in materials became much more acute and respondent company adopted the policy of accepting no new accounts of any kind and of rationing or allocating the merchandise it produced among its established accounts. Since the Fall of 1942, the company has experienced an extreme shortage in materials with which to manufacture its products and has been primarily concerned with getting enough materials to supply the demand. Continuously since the Fall of 1942, the company has been forced to cut down orders received by substantial amounts, sometimes by as much as 75%, and the company has refused all orders from new accounts, many of them calling for large amounts of respondent's merchandise. In these circumstances, respondent company has had no need whatever for the services of a salesman to do the work formerly done by petitioner and it does not now have need for such a salesman. The company now has no salesman in any territory performing work similar to that formerly done by petitioner.

8. Since April 20, 1942, respondent company has had no salesman, in petitioner's former territory or elsewhere, performing the sales work formerly performed by petitioner and respondent company does not now have such a salesman in the field; petitioner's job has ceased to exist. Since that date circumstances have so changed that prior to May, 1944, and continuously since that date, respondent company has had no need for such a salesman because it has been and is now unable to produce enough merchandise to satisfy the orders received without any solicitation by anyone.

9. In January, 1945, and from time to time since that date, respondent company has circularized its retail accounts stating that it wishes to purchase back any stock of viewers or films previously manufactured and sold to such accounts and respondent company has in fact purchased back some of its merchandise and resold and reallocated same among its established accounts.

10. During the years 1944 and 1945, respondent company has operated on a plan under which the company circularizes its retail accounts to collect the names, departments and addresses of those who wish to purchase its merchandise and then allocates to each of the established accounts which have given it such information a certain number of viewers and films. In the month of May, 1944, when petitioner applied for reinstatement, respondent company's circumstances had so changed as to make it impossible and unreasonable to reinstate the petitioner as a salesman of its products or to place petitioner in any position of like seniority, status and pay, and continuously since that date to the present time, the circumstances in respondent's business have continued to make it impossible and unreasonable to reinstate petitioner.

11. Petitioner continued to solicit orders while he was in the Army until the Fall of 1942, but when the amount of the commissions being paid to him was cut at that time, petitioner prepared a written contract to cover a period of five years beginning on the day he was discharged from the Army, under which proposed contract petitioner was to have the same sales territory as before with some additional states; when the company refused to sign that contract, petitioner visited five of his larger retail accounts in New York City and some of them agreed that they would cease to buy merchandise from respondent company the moment petitioner gave the word; petitioner indicated at that time that, if the company refused to enter into the contract proposed by him, he would attempt to destroy their business with the accounts that he had formerly solicited.

224

12. Again in the year 1945, petitioner wrote to respondent company stating that, if they refused to place him back in his former sales territory to act as salesman for respondent's products, he would ruin respondent company's business in the Eastern states.

13. Because of the threats made by petitioner to ruin respondent's business and because of his conduct in connection with the accounts in New York from which he had formerly solicited orders, the petitioner has shown himself wholly unqualified now to perform the work as salesman of respondent's products, and it would be unreasonable, in the light of petitioner's threats and conduct, to compel respondent now to reinstate him as salesman or in any other capacity.

Conclusions of Law

1. The Court has jurisdiction of the subject matter of this suit under Section 8(e) of the Selective Training and Service Act of 1940, 54 Stat. 890, 50 U.S.C.A. Appendix, § 308(e).

2. The contractual status of petitioner was that of an independent contractor and as such, petitioner is outside of the scope of the provisions of Section 308 of the Selective Training and Service Act of 1940; petitioner has failed to show that, prior to his induction into the United States Army, he held a position in the employ of the respondent company and therefore his petition must be denied.

3. The circumstances of respondent company had so changed since April 20, 1942, and prior to May 19, 1944, as to make it impossible and unreasonable for respondent company to reinstate petitioner as a salesman of its products or to any other position with said company of like seniority, status and pay and the circumstances of respondent company have since May 19, 1944, continuously remained such as to make it impossible or unreasonable for the company to reinstate petitioner as a salesman of its products or to any other position with said company of like seniority, status and pay; respondent company did not have in May, 1944, and has not had since that date, either the position formerly occupied by petitioner or any position of like seniority, status and pay. Respondent company was and is now fully justified in refusing to reinstate petitioner.

4. On the above Findings and for the above reasons, the Court finds the issues herein for the respondent and against the petitioner and the Clerk is directed to enter judgment herein for the respondent; that petitioner take nothing by this suit, and that the respondent receive no costs of suit.