### HUDSPETH v. STANDARD OIL CO. OF NEW JERSEY.

No. 188.

District Court, W. D. Arkansas. Harrison Div.

Sept. 25, 1947.

R. S. Wilson, U. S. Atty., David R. Boatright, Asst. U. S. Atty., and Charles A. Beasley, Jr., Asst. U. S. Atty., all of Fort Smith, Ark., for plaintiff.

Moore, Burrow, Chowning & Hall, of Little Rock, Ark., Arthur M. Curtis, of Baton Rouge, La., and C. Horace Tuttle, of New York City, for defendant.

JOHN E. MILLER, District Judge.

This case was consolidated with Civil Action No. 189, W. A. Thompson, Plaintiff, v. Standard Oil Company of New Jersey, Defendant, on the ground that both cases involve common questions of law and fact. In all practical respects the cases are similar but there are some material differences, so that it is deemed advisable to make and file findings of fact and conclusions of law in each case. The cases were tried separately April 9, 10 and 11, 1947, but upon the understanding that all common questions might be considered in each case regardless of whether the particular common question appears in the record of the trial of both cases. See, Rule 42, Federal Rules

of Civil Procedure, 28 U.S.C.A. following section 723c.

At the conclusion of the introduction of testimony in the Thompson case, Civil Action No. 189, both cases were submitted, but the attorneys for the defendant asked and were granted time in which to furnish a typewritten transcript of the testimony and exhibits in each case. In due time such transcript was made by the official reporter and filed herein, whereupon an order was entered allowing the plaintiffs, in both cases, until July 25, 1947 to file their written brief and argument and the defendant was allowed until September 1, 1947 in which to file its brief and argument.

Learned attorneys have filed comprehensive and thorough briefs and arguments in support of their respective contentions and the Court here expresses its appreciation of the helpful, able and conscientious efforts of the attorneys for both plaintiffs and the defendant in the development of the facts and the presentation and application of the law to the facts.

The learned attorneys for the defendant on defendant's brief in the introductory statement say:

"At the opening of the plaintiff's brief four questions are propounded, the first of which is:

" 'Did the plaintiff prior to his induction into the United States Navy on April 24, 1944, hold a position other than temporary in the employ of the defendant company as contemplated under the provisions of the Selective Training and Service Act of 1940, as amended?'

"Since the other three questions propounded by plaintiff's counsel are secondary to the question quoted above, and since such secondary questions, like plaintiff's whole case, must stand or fall upon the answer to the first question, we are concentrating our brief upon that question, which is the real issue in the case."

Notwithstanding the above statement of the attorneys the Court feels that findings of fact and declarations of law, separately stated, should be made on every question presented by the pleadings and having considered all the ore tenus testimony and exhibits thereto, the deposition on file and

the briefs and arguments of the parties, now makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

1. The plaintiff, Verl Hudspeth, is a citizen of Arkansas and a resident of Boone County, Arkansas.

2. The defendant, Standard Oil Company of New Jersey, is a corporation organized under the laws of the State of Delaware and authorized to do business in the State of Arkansas.

3. The plaintiff's connection with the defendant (formerly Standard Oil Company of Louisiana) began in September, 1936 and continued until April 17, 1944, on which date he severed his connection preparatory to induction into the armed forces of the United States, which occurred on April 24, 1944. He served in the Navy until January 12, 1946, at which time he was honorably discharged and received a certificate attesting that he had satisfactorily completed his period of training and service in the armed forces.

On January 24, 1946 he applied in person at the division office of the defendant in Little Rock, Arkansas for reinstatement or reemployment by the defendant in accordance with the provisions of the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 301 et seq. At that time the plaintiff was, and still is, in good physical condition, able and qualified to perform the duties of the position formerly held by him with the defendant, which was consignment distributor under a written contract dated August 1, 1943 and amended December 8, 1943 as of November 22, 1943. Such position was other than temporary and the circumstances of the defendant then or at the time of the trial had not so changed as to make it impossible or unreasonable to restore the plaintiff to such position or a position of like seniority, status and pay, but defendant failed and refused to reemploy or reinstate the plaintiff as consignment distributor or in any other position of like seniority, status and pay.

4. From November 13, 1940 to August 1, 1943, the plaintiff's connection with the defendant was that of "Agent" under a written contract which was renewed from year to year. It is not necessary to set out the provisions of the prior contract although it was introduced in evidence. On August 1, 1943 the commission agent contract was superseded by the consignment distributor contract, amended as of November 22, 1943, and was in force on the date plaintiff severed his connection with the defendant. Under this contract, as amended, the plaintiff was designated as "Consignee" and the defendant as "Consignor". Inter alia it was provided:

"Consignor agrees to deliver on consignment to consignee's place of business at Harrison, Arkansas such quantity of consignor's products as consignee desires for resale to consignee's customers in the area specified in schedule 'A' attached, and consignor further agrees to sell to consignee such products at the minimum prices consignor authorizes for resale by consignee to such customers on the terms and conditions hereinafter set forth, and to purchase from consignee without recourse, if properly assigned, accounts receivable, within limits approved, arising from sales by consignee of such of the consigned products as he may purchase, to customers where credit has been approved in writing by consignor."

The plaintiff was required to bear all expenses incident to the conduct of the business and sale of the products; furnish trucks and part of the equipment required in the conduct of the business; hire and pay the wages of all assistants and employees he required for the operation of his business and assume full direction and control over and responsibility for all such assistants and employees.

The defendant was required to pay freight on the products shipped and taxes on its merchandise stock and equipment. Title to all products consigned and delivered to consignee remained in consignor until they were purchased by consignee in accordance with the contract.

The plaintiff accepted full and exclusive liability for all premiums, taxes, assessments, etc. under the various social legislation of both the State and Federal governments.

The contract was to continue in force for one year and unless either party was given notice at least 30 days prior to the end of the year the same was deemed to be renewed from year to year.

5. On July 27, 1943 the defendant leased to the plaintiff the land, in the City of Harrison, Arkansas, effective August 1, 1943, upon which its facilities for storing and handling its products were located for an annual rental of $180.00. The lease was renewable under the same terms as the contract referred to in paragraph four hereof. The plaintiff assumed liability for all taxes except real property taxes, but it was provided that if any of the property was slightly damaged by fire or other causes that the premises should be repaired by defendant and an abatement on the rent allowed to the plaintiff for such time as the premises were untenantable.

6. After the execution of the consignment distributor contract by the parties on August 1, 1943, and the lease of the bulk plant by the defendant to the plaintiff, the business proceeded under the terms of the contract, and the plaintiff was required to pay a rental on the real property of defendants, which was furnished without rent under the commission agency contract, in the amount of $15.00 per month or $180.00 annually, but in order to reimburse the plaintiff the defendant raised the commissions payable to plaintiff so the payment of the rental did not affect the amount of the compensation earned by plaintiff.

Under the commission agency contract the invoice of a sale to a customer was evidenced by a delivery ticket showing delivery by plaintiff of the products and the price thereof and if the credit of the customer was approved the plaintiff signed the delivery ticket as provided thereon showing that he, as salesman, had received the purchase price for the defendant. Under the consignment distributor contract he, as seller, merely assigned the ticket or invoice to the defendant and defendant accepted the same as a payment by plaintiff for the purchase by him of such products.

In testifying as to the reasons that impelled the defendant to abandon the commission agency contract and substitute therefor the consignment distributor contract, Honorable Clifford Horace Tuttle, one of the attorneys for the defendant, said:

"There is no question but what under that contract (commission agency) the company had potential control sufficient to establish an employer-employee relationship, regardless of whether they exercised that control or not. Subsequently the Treasury Department issued a square ruling that the bulk plant commission agents were employees for Social Security purposes. The proposition was presented to me to establish an operation, if possible, that—not necessarily would relieve the company from the liability, but would relieve the company from a liability if it had no control upon the commission agent and the commission agent's employees. Accordingly, the original consignment distributor contract was prepared. That was in the summer of 1943 and that is the original contract that was executed by Mr. Hudspeth which went into effect about August 1, 1943. Now, under that contract the consignment distributor was selling the products of the company for the account and risk of the company."

However, the original contract was amended as of November 22, 1943, in the manner set forth in paragraph four hereof by providing that the products were sent to consignee for resale by him and that the title to the products should remain in consignor until they were purchased by consignee for resale.

7. The operations of the plaintiff subsequent to the execution and the amendment of the consignment distributor contract were not inconsistent with the contract as amended. The defendant was not held out to the public as the seller although it assigned to the plaintiff the contracts for business which the defendant held in its own name with various consumers and service stations. The assignment of such contracts was made to enable the plaintiff to make the sales and deliveries on his own account. The plaintiff fixed his hours of work and the name of the defendant did not appear on any of his trucks. He was not restricted in his sales to various persons. He carried his own liability insur-

ance, workmen's compensation and naturally paid all the taxes on his own equipment, which was assessed in his own name. He was required to account for merchandise consigned to him. He developed his own trade in his own way and had complete authority over his employees as to time, place, and hours worked. He paid bills for light, heat, and telephone and employed and paid his own truck drivers. He paid social security taxes on them and made income tax withholdings. He paid rent on the bulk plant under the terms of the lease. He paid for his local advertising, although the defendant did at intervals advertise some products and did itself pay for such advertising. He could sell for cash or credit but sales to customers whose credit had not been approved by the defendant were made at the risk of the plaintiff.

8. In the operation of the bulk plant and distribution of the products of the defendant, the plaintiff acquired trucks and certain equipment in addition to that owned by the defendant and leased to the plaintiff, and when it became apparent that the plaintiff would be inducted into the armed forces of the United States and that the business would have to be operated by someone else, the plaintiff and defendant began negotiating for the sale or transfer of the property owned by the plaintiff. The plaintiff wanted $2273.56 and the District Manager of defendant agreed to pay plaintiff said sum for the truck and equipment, but said sum exceeded the then ceiling price of said truck and equipment by approximately $800.00. So the purchase price was divided and the plaintiff was paid $1473.56 for the truck and equipment described in the bill of sale executed by plaintiff, dated April 24, 1944, the date of his induction into the armed forces, and $800.00 for the cancellation of the bulk plant consignment agreement and lease of the bulk plant. This cancellation was dated April 18, 1944 and executed by the plaintiff. These instruments were executed by the plaintiff in blank at the request of the defendant and to place the defendant in a position to either operate the bulk plant itself or by someone else during the absence of the plaintiff caused by his induction into the armed forces.

In receiving the money and executing the instruments it was not the intention of either party to alter or determine the status of the plaintiff, as fixed by the Selective Training and Service Act of 1940, as amended.

9. Under the consignment distributor contract all products shipped to the plaintiff were consigned to the plaintiff as consignment distributor, while under the commission agency contract such shipments were consigned to the defendant company. Between 1936 and November 13, 1940 the plaintiff operated a bulk plant at Marshall, Arkansas but the contract was in the name of his brother. The plaintiff took charge of the bulk plant at Harrison under the commission agency contract dated November 13, 1940 and as heretofore stated remained in charge until he was inducted into the armed forces. Practically all the customers were approved as to credit by the defendant and the contracts of sale were assigned to the defendant in payment of the purchase price. In the event the sale was for cash the plaintiff would remit the entire sale price and at the end of the month the defendant would calculate the amount due the plaintiff and send him a check therefor. The gross commissions received by plaintiff from April 1, 1943 to March 31, 1944 were $8,651.34. After deducting operating expenses of $2,438.59, his net commissions were $6,212.75 or $517.71 per month for the year immediately preceding his induction. The gross commissions on the total sales from the Harrison bulk plant from January 24, 1945 through February, 1947 were $31,983.96 and figured at the same rate which was being paid the plaintiff at the time of his induction the gross commission for the month of February, 1947 would be $1,513.70. Thus the amount of business increased, but likewise cost of operation increased, and it seems fair to say that plaintiff could have earned, had he been reinstated, at least $600.00 per month net. He earned at other employment from March, 1946 to March, 1947 $200.00 per month and at the time of the trial was earning $300.00 per month net, so the plaintiff has lost an average of $350.00 per month by reason of not being reinstated.

### Discussion

At the time the plaintiff's connection with the defendant was severed in order that he might perform training and service in the armed forces of the United States, did he hold a position in the employ of the defendant or was he an independent contractor?

■ If he was an independent contractor the act does not apply. Kay v. General Cable Corporation, 3 Cir., 144 F.2d 653, 654; Frank v. Tru-Vue, Inc., D.C.S.D.Ill., 65 F.Supp. 220; MacMillan v. Montecito Country Club, Inc., D.C.S.D.Cal., 65 F. Supp. 240; Karas v. Klein, D.C.Minn., 70 F.Supp. 469; Featherston v. Jersey Central Power & Light Co., D.C.N.J., 66 F.Supp. 882; Brook v. Winter Haven Golf Club, Inc., D.C.S.D.Fla., 69 F.Supp. 399. These cases, as do Lee v. Remington Rand, Inc., D.C.S.D.Cal., 68 F.Supp. 837; David v. Boston & M. R. R., D.C.N.H., 71 F.Supp. 342; and Fishgold v. Sullivan Drydock & Repair Corporation et al., 328 U.S. 275, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230, 167 A.L.R. 110, further hold that in determining the question here presented that the Act must be construed as liberally as possible for the benefit of the veteran, who left private life to serve his country in its hour of need. In the use of the words "in the employ of any employer", the Congress intended to broaden the ordinary concept and include within the terms of the Act relationships that would not, under a literal interpretation, come within the classification of employee and employer. Courts are not permitted to go beyond the expressed intention of the Congress and read into the Act provisions that it failed to include, even though it may now appear that the provision is not broad enough to protect every veteran and require his reinstatement in the position that he held when he entered the armed service. The question cannot be fairly determined by the application of abstract tests or formulae or the usual common law principles. The terms of the written contract are not in themselves decisive and neither are the actions of the parties themselves. "It is the total situation that controls". Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 1550, 91 L.Ed. ——. In other words, all factors and circumstances should be considered in determining the nature of a disputed relationship and the purpose that the Congress was seeking to accomplish should be kept constantly in mind in deciding whether the actual relationship is one that fairly comes within the provisions of the Act.

■ With these principles in mind as a guide in applying the law to the facts as found and heretofore set forth, the Court is of the opinion that the relationship between the plaintiff and the defendant was that of an independent contractor. In view of the facts and what the parties did in establishing the relationship and their subsequent actions in recognition thereof, the cases of United States, Petitioner, v. Silk and Harrison, Petitioner, v. Greyvan Lines, Inc., 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. ——, decided June 16, 1947, by the United States Supreme Court, are controlling and require this conclusion. See, also, Frank v. TruVue, Inc., supra.

### Conclusions of Law

■ 1. The Court has jurisdiction of the parties and the subject matter of the suit under sec. 8(e) of the Selective Training & Service Act of 1940, as amended, 54 Stat. 890, 50 U.S.C.A.Appendix, § 308(e).

2. The relationship of the plaintiff to the defendant on and prior to the date of his induction into the armed forces of the United States was that of an independent contractor and as such is not within the provisions of the Selective Training and Service Act of 1940, as amended.

3. The plaintiff has failed to prove that prior to his induction into the United States Navy, he held a position in the employ of the defendant and is not entitled to recover herein.

4. Judgment will be entered herein dismissing the complaint of plaintiff and that he take nothing by this suit, and that the defendant recover no costs of suit.