## TEXAS INDEMNITY INS. CO. v. HALLIBURTON et al.

### No. 6329.

Court of Civil Appeals of Texas. Texarkana.

Feb. 20, 1948.

Rehearing Denied March 4, 1948.

Edwin M. Fulton, of Gilmer, W. C. Han-:ock, of Pittsburg, and Fountain, Cox &

Gaines, Joyce Cox and J. M. Slator, all of Houston, for appellant.

Davis & McNeill, of Center, Florence & Florence, of Gilmer, and D. S. Meredith, Jr., of Longview, for appellee.

HALL, Justice.

This is a workman's compensation case. In the trial court appellant Texas Indemnity Insurance Company was plaintiff and cross-defendant and appellees, Mrs. Delia Halliburton et al. were defendants and cross-plaintiffs. Appellees with the exception of Billie G. Carter, who is a party pro forma, claimed compensation as statutory beneficiaries of (Bonnie) B. Halliburton, who was killed March 23, 1944, while loading railroad ties at a tie yard in Gilmer, Upshur County, Texas. All issues were settled by trial stipulations with the exception of the issue as to whether B. B. Halliburton was on the date of his injury and death an independent contractor, or an employee of the assured, Kirby Lumber Corporation, within the meaning of the Workmen's Compensation Act. Vernon's Ann.Civ.St. art. 8306 et seq. However, the stipulation was made subject to appellees' exception to the action of the trial court in permitting appellant to verify its answers to appellees' request for admissions of fact. The case was tried to a jury, and on the jury's findings that B. B. Halliburton was an employee of the assured on the date of his death and not an independent contractor, judgment was entered for appellees.

By points one and two appellant asserts that the trial court erred in (a) "refusing to hold that as a matter of law B. B. Halliburton was not an employee of the assured, Kirby Lumber Company, within the meaning of the Workmen's Compensation Act at the time of his injury and death"; and (b) "in refusing to hold that as a matter of law B. B. Halliburton was an independent contractor." These two points present the controlling issue here.

The evidence shows that B. B. Halliburton and his son E. B. Halliburton were partners in the business of farming and cattle-raising in Shelby County before and at the time of their employment by Kirby Lumber Company; that they owned two

farm tractors and other farm machinery which, in addition to their farming, were used by them in constructing dams and terraces for various persons in the community where they lived. They received as pay for such work $3.00 per hour and they were engaged in this business when approached by Smith Sanders, a representative of Kirby Lumber Company, hereinafter referred to as the assured, who sought to and did employ them to load cross ties and switch ties at different tie yards operated by assured. The price offered by Sanders was $1.50 per thousand board-feet for ties loaded. This price was not accepted by Halliburtons. However, an agreement was made between them whereby they would load one or two cars of ties to determine whether the price offered, $1.50 per thousand feet, would equal $3 per hour, which Halliburton had been receiving for constructing dams and terraces. After the experimental loading had been completed, a price of $2.00 per thousand feet was agreed upon. The Halliburtons knew nothing about loading ties and so informed Sanders who told them they didn't need to know anything about the method of loading ties as "some of us will be there to show you how to do and what to do." Sanders did show them and they used his method during the entire time they worked for assured.

The cross-ties were assembled at various tie-yards along different railway systems in East Texas and were stacked adjacent to spur tracks extending into the yards from the main railway lines. The ties were to be loaded in open top railway cars known as gondolas which were spotted on the spur tracks near the stacks of ties. Sanders showed them how to affix a gin pole to the side of the gondola car; this pole extended upright several feet above the top of the car and at the top end was fastened a pulley block. A steel cable was run through the block and one end fastened to Halliburton's farm tractor and the other around the cross-ties. Two parallel skid-poles were laid on the ground between the tie stacks and the car, at right angles to each, and at the end nearest the car other parallel skid poles were placed upright to the top of the car, the upper ends of which were notched so as to fit into the upper edge of the car to prevent them from slipping. The ties were pulled by the truck by means of the cable and block along the skid-poles and placed in the car. In loading the ties certain rules were to be observed by the Halliburtons, namely, (1) no car was to be loaded above the level of the top; (2) ties of the same kind of wood were to be loaded together in the car; (3) rejected ties known as "O-outs" were not to be loaded; (4) each stack of ties in the car was to be placed on two cross timbers so as to prevent the ties from resting on the bottom of the car; and (5) no uninspected ties were to be loaded.

In the operation of loading the ties Halliburtons furnished their own equipment, such as trucks and cables; paid for all oil and gas used; maintained their equipment, and employed and paid their laborers. They were notified when cars were to be spotted at a tie yard and were expected to be on hand to load them so as to facilitate the moving of the ties and prevent demurrage charges against assured. On at least one occasion Halliburtons were not able to load ties when called by assured and asked a postponement of the loading date, which was granted. They could load as many ties at a drag as they saw fit, just so the work was expedited. Halliburtons set the hours they would work, that is, the time to begin and quit. For each loading out from a tie yard, Halliburtons were paid by assured. On some occasions the check was made payable and delivered to the father, B. B. Halliburton, and on others to the son, E. B. Halliburton. Sometimes B. B. Halliburton directed the loading of the ties and at other times E. B. Halliburton directed the loading, for the reason that the absent partner would be away attending to other partnership activities. Halliburtons loaded ties for assured on several occasions from September, 1943, through March, 1944. The record is not clear whether the contract made at the beginning covered all the loadings during this period, or whether a separate contract was made covering each loading. Be this as it may, the operations and conduct of the parties were the same throughout the time. During the existence of this relationship covering about 200 days Halliburtons did not work all the time load-

ing ties but only for about 45 days of said time were they engaged in such business. Neither of the Halliburtons was on the payroll of assured as employees, nor did they or their employees make application to assured for employment. No physical examination was made and no withholding tax exemption certificate signed by them as required by assured for prospective employees. Assured paid no workmen's compensation coverage for either of the Halliburtons or their employees.

There is evidence in the record by E. B. Halliburton to the effect that he noticed that some of the checks received by his father from assured contained a small box at the right-hand corner for three deductions—"Withholding tax, Social Security, and something else." This witness testified further about the deductions from their checks, "I don't remember whether deducted from it or not, I remember it stated in there how much was deducted, never noticed whether it had been taken from it or not." The record also shows that on occasions assured's agents would instruct Halliburton's employees to clean up the tie yards and saw bad ends off of rejected ties and fill deep ruts in the dirt road leading to the tie yards. This work was done usually with tools owned by assured, such as shovels and cross-cut saws. On one occasion when Halliburtons were short of one hand assured's agent employed a laborer to work with them for one day and paid his salary. At the time Halliburtons entered into the original contract Sanders, assured's employee, stated "that if any of our hands were disagreeable he wanted to fire them; that he did not want a bunch of Smart Alex Negroes on the yard." This is in substance an overall picture of the dealings and relationship of the Halliburton partnership with Kirby Lumber Company, assured.

It is said in Hudspeth v. Standard Oil Co. of New Jersey, D.C., 74 F. Supp. 123, 128, that: " 'It is the total situation that controls'. Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 1550, [172 A. L.R. 317]. In other words, all factors and circumstances should be considered in determining the nature of a disputed rela-

tionship." Observing the above rule we have looked to all the facts and circumstances in this case to determine the relationship existing between assured and Halliburtons during the tie-loading period, and have concluded that the Halliburtons were independent contractors and not employees of assured. The "total situation" forces this conclusion. We think it clear from the record that the supervision of the work exercised by assured's agents was for the sole and only purpose of seeing that the contract was carried out in accordance with its terms. This case, in our opinion, is controlled by the principles of law announced in Shannon v. Western Indemnity Co., 257 S.W. 522, and Smith Bros., Inc., v. O'Bryan, 127 Tex. 439, 94 S.W.2d 145, both by the Commission of Appeals and adopted by the Supreme Court. We shall not discuss the above cases but attention is directed to them and the numerous authorities therein cited as being applicable and controlling in all of the fact situations in this case. See also Western Indemnity Co. v. Shannon, Tex.Civ.App., 242 S.W. 774, by this court. Appellant's Propositions 1 and 2 are sustained.

Appellees, by cross-assignment, assert that the court erred in permitting appellant belatedly to attach its affidavit to appellees' request for admissions under Rule 169, T.R.C.P. On October 30, 1946, over two years after filing of this case in the court below and nearly one year after a trial of the case had been halted and a continuance ordered on account of the illness of one of appellant's witnesses, appellees' attorney, McNeill, delivered to assured's attorney, Slator, their request for admissions. On November 1st, Slator answered said request and immediately forwarded same to the appellees' counsel, McNeill, at Center, Texas. The answers were delivered to McNeill well within the ten-day period allowed in said request, but no affidavit was attached to them. About thirty days after the answers were delivered to appellees' counsel, appellant's counsel, Slator, prepared an affidavit bearing the same date as the answers and mailed it to McNeill, at Center, with the request that it be attached to the answers. This was

refused. At the beginning of the trial appellant made application to the trial court for permission to attach its affidavit to the answers. This provoked a hearing before the trial court at which both McNeill and Slator were witnesses. It was appellees' contention that the failure to attach an affidavit to the admissions rendered them ineffective, and, under Rule 169, their case was admitted. It is appellant's contention that the circumstances, hereinafter discussed, surrounding the request for admissions render harmless appellant's failure to attach its affidavit. Slator testified that at the time McNeill delivered to him appellees' request for admission they discussed it together and the suggestion was made by one of them that the same result could be obtained by stipulating the facts, and that McNeill said that he did not know whether he would insist on the admissions or would stipulate the facts. At the time of the trial of the case, stipulations were entered into by the parties and in the trial in the court below and here the only disputed issue was whether or not the Halliburtons were independent contractors or were employees of Kirby Lumber Company under the terms of the Employers' Liability Act. It is clear from this record that appellees were in no way misled or harmed by the trial court's permitting appellant to attach their affidavit to the request for admissions. McNeill testified that he was not misled. As stated above, nearly a year before the request for admissions was made, this case went to trial in the court below and proceeded for a day or two when it was discovered that one of appellant's witnesses was sick and unable to appear in court and continuance was ordered. Several depositions had been taken in which it clearly appeared what defense was being urged by appellant. In such circumstances the trial court did not err in permitting appellant to attach its formal affidavit to the answers to the request for admissions filed by appellees. To hold otherwise, under the facts of this record, would be to deny appellant its full rights in the trial of this case. We are fully aware of the holding by this court in Croan v. McKinney, Tex.Civ.App., 185 S.W.2d 768. The facts in that case are materially different from the facts here, and for that reason it is not in point. However, in that case we held that the trial court has some discretion in applying Rule 169.

The conclusion reached above renders unnecessary a discussion of the other points advanced by the parties herein.

The judgment of the trial court is reversed and the judgment here rendered for appellant.