### HUDSPETH v. ESSO STANDARD OIL CO.
### THOMPSON v. ESSO STANDARD OIL CO.
Nos. 13692, 13693.

United States Court of Appeals
Eighth Circuit.
Nov. 10, 1948.

[1] Revised Judicial Code, 28 U.S.C.A. § 2243.

David R. Boatright, Asst. U. S. Atty., of Fort Smith, Ark. (R. S. Wilson, U. S. Atty. and Charles A. Beasley, Jr., Asst. U. S. Atty., both of Fort Smith, Ark., on the brief), for appellants.

Frank E. Chowning and J. Merrick Moore, both of Little Rock, Ark., C. Horace Tuttle, of New York City, and A. M. Curtis, of Baton Rouge, La., for appellee.

Before SANBORN, WOODROUGH, and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

These appeals are from judgments of dismissal in actions brought by the plaintiffs (appellants), which were consolidated for trial and tried to the District Court. The actions were brought under § 8(e) of the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 308(e). Each plaintiff asserted, in effect, that at the time of his induction into the armed service of the United States he held a nontemporary position as a Commission Agent in the employ of the defendant (appellee), to which position, upon his honorable discharge from the service, he was entitled to be reinstated, by virtue of § 8(b)

of the Act, 50 U.S.C.A.Appendix, § 308 (b); that, after his discharge, he duly demanded reinstatement; and that the defendant wrongfully refused to restore him to the position. The relief prayed for by each plaintiff was an order compelling the defendant to reinstate him and to compensate him for the loss of wages suffered by reason of its refusal to reinstate him. The defendant denied that either of the plaintiffs held a position in its employ at the time of his induction into the service.

The controlling issue of fact in each case was whether, at the time of induction, the plaintiff "left * * * a position * * * in the employ of" the defendant within the meaning of § 8(b) of the Act. The plaintiffs asserted, and at the trial endeavored to prove, that each of them held such a position. The defendant contended, and sought to establish, that the plaintiffs did not hold positions in its employ, but were in business for themselves or were independent contractors. The District Court filed findings of fact and conclusions of law in each case.[1] The court determined that "The relationship of the plaintiff to the defendant on and prior to the date of his induction into the armed forces of the United States was that of an independent contractor and as such is not within the provisions of the Selective Training and Service Act of 1940, as amended"; and that "The plaintiff has failed to prove that prior to his induction into the United States Navy, he held a position in the employ of the defendant and is not entitled to recover herein." Judgment in favor of the defendant was thereupon entered in each case, and these appeals followed.

Counsel for the appellants in their brief state that the question to be decided by this court is "whether or not these veterans left positions in the employ of the defendant or whether they were independent contractors." That, of course, was the ultimate question of fact tried by the District Court and determined by it adversely to the plaintiffs.

Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., precludes

---

[1] See D.C., 74 F.Supp. 123, 128, for the findings and opinion in the Hudspeth case.

this Court from setting aside a finding of fact of a trial court in a nonjury case unless the finding is clearly erroneous. This Court has consistently ruled that a finding of fact is not clearly erroneous unless it is without adequate evidentiary support or results from a misconception or misapplication of the law. See Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1, 4, 5; Travelers Mutual Casualty Co. v. Rector, 8 Cir., 138 F.2d 396, 398; Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417, 150 A.L.R. 1056; Voss Bros. Mfg. Co. v. Voss, 8 Cir., 157 F.2d 263, 266. Compare, United States v. United States Gypsum Co., 333 U.S. 364, 394, 395, 68 S. Ct. 525.

■ While it is true that, by virtue of Rule 52(a) of the Federal Rules of Civil Procedure, this Court now acts as a court of review in all nonjury cases, in accordance with the practice which formerly prevailed in equity appeals, it does not retry cases or substitute its judgment for that of the trial court with respect to fact issues if the trial court's determination of such issues is not demonstrably wrong. Storley v. Armour & Co., 8 Cir., 107 F.2d 499, 513, and compare McComb v. McKay, 8 Cir., 164 F.2d 40, 49. And this was true in equity cases prior to the promulgation of the Federal Rules of Civil Procedure. Treat v. Rogers, 8 Cir., 35 F.2d 77, 78; Kennedy v. City of White Bear Lake, 8 Cir., 39 F.2d 608, 610; Karn v. Andresen, 8 Cir., 60 F.2d 427, 429.

■ The precise question for decision by this Court, then, is whether the determination of the District Court that the plaintiffs were independent contractors at the time they were inducted into the service, is clearly erroneous. The findings of that court with respect to the evidentiary facts are unchallenged. We assume, therefore, that the real contention of the appellants is that the conclusion reached by that court in each case is wrong because induced by a misapplication of the law to the evidentiary facts.

There is no substantial distinction between the two cases. For the sake of clarity, we shall deal with the case of Verl Hudspeth as being typical of both.

From November 13, 1940, to August 1, 1943, Hudspeth was a Commission Agent of the defendant at its bulk plant in Harrison, Arkansas. The "Commission Agency Agreement" referred to the defendant as "principal" and to Hudspeth as "agent." It provided that "Principal does hereby engage Agent to superintend, manage and operate its bulk plant for the receipt, storage and sale in the areas specified in Schedule 'A' of kerosene, gasoline and other motor fuels, lubricating oils, greases and other petroleum products and other merchandise dealt in by Principal for account of Principal upon the premises situated in the City of Harrison, County of Boone, State of Arkansas * * *." This agency agreement required the "agent" to pay for lights, heat, water, power, telephone and other expense "pertaining to the efficient operation of this Bulk Plant"; to operate it "and such motor vehicles as are used," in compliance with the rules and directions of the "principal" and in a manner satisfactory to it; to keep the plant open for business during such hours as the "principal" should specify; to push the sale and sell products supplied by it; to hold the "principal" harmless for claims, damages or loss occasioned by the acts of the "agent", his assistants or employees; to pay to the "principal" 20% of the manual rate for public liability and property damage insurance procured by the "principal" on motor vehicles used by the "agent"; to accept liability for the payment of "all contributions and taxes for unemployment compensation insurance, of old age pensions or annuities, now or hereafter imposed by any Federal or State governmental authority, which are imposed with respect to or measured by the wages, salaries or other remuneration paid to persons employed by Agent, * * *." The agreement also provided that, upon its termination, all customers served by the "agent" should revert to the "principal", and the "agent" should have no rights with respect to business thereafter done with such customers; and that the "agent" should turn over to the "principal" the entire plant together with the merchandise then on hand and the equipment furnished by the "principal". For his services as

Commission Agent, Hudspeth was to receive, by the terms of the agreement, certain specified commissions. The agreement contained other provisions, but enough has been said to indicate its nature and legal effect.

The defendant took the position that under this "Commission Agency Agreement," the "Commission Agent" was not its employee; but the federal taxing authorities ruled to the contrary. The defendant was obliged to pay social security taxes and to withhold income taxes with respect to such "agents".

The "Commission Agency Agreement" of November 13, 1940, was, on August 1, 1943, superseded by a different arrangement (evidenced by a lease and a "Bulk Plant Consignment Agreement"), obviously intended to give Hudspeth an independent status. On July 27, 1943, Hudspeth leased from the defendant its bulk plant and equipment at Harrison, Arkansas. The lease ran from August 1, 1943, to July 31, 1944. It was to be automatically renewed from year to year "unless and until either party" gave "to the other thirty (30) days' prior written notice of its intention to terminate the lease at the end of the first year or at the end of any subsequent yearly period." The only restriction in the lease as to the use of the leased premises was that they were "to be used and occupied by Lessee only for conducting a business consisting mainly of the storage and distribution of petroleum products and automobile accessories."

The "Bulk Plant Consignment Agreement," entered into on August 1, 1943, by the defendant and Hudspeth, referred to the defendant as "consignor" and to Hudspeth as "consignee". By the terms of this agreement, the defendant contracted "to deliver on consignment to Consignee's place of business at Harrison, Arkansas, such quantity of Consignor's products as Consignee desires for sale in the area specified in Schedule 'A' attached, on the terms and conditions hereinafter set forth." Under this agreement, the "consignee" [Hudspeth] was required "to promptly account for all Consignor's moneys and property in his possession"; to sell the products of the "consignor" to such customers within the specified area as the "consignee" might select, either for cash or on credit properly authorized (except that the "consignee" might extend any amount of credit to any customer on his own account, provided he paid the "consignor" in cash for sales made in excess of credit authorized by it); to refrain from selling the "consignor's" products at less than its authorized prices; "to bear all expenses incident to the conduct of his business"; to "furnish trucks and other equipment" required by him "in the conduct of his business"; to "hire and pay the wages of all assistants and employees" required "for the operation of his business, and assume full direction and control over and responsibility for all such assistants and employees"; and to pay "all premiums, contributions, and taxes for workmen's compensation insurance, unemployment insurance, and for old age pensions, annuities and retirement benefits, now or hereafter imposed by or pursuant to Federal and State laws, which are measured by the wages, salaries, or other remuneration paid to persons employed by Consignee * * *." The "consignor" [defendant] was required to pay freight on products shipped and taxes on its merchandise stock and equipment, and to pay commissions to the "consignee" as provided in a schedule attached to the agreement. Title to all products consigned and delivered to the "consignee" was to remain in the "consignor" until sold by the "consignee". The agreement was to continue for one year, and provided for its yearly renewal, but could be terminated at the end of any yearly period by either party upon giving at least thirty days' written notice to the other.

On November 22, 1943, the "Bulk Plant Consignment Agreement" of August 1, 1943, was amended by striking out certain paragraphs and substituting in lieu thereof the following:

"1. Consignor agrees to deliver on consignment to Consignee's place of business at Harrison, Arkansas, such quantity of Consignor's products as Consignee desires for resale to Consignee's customers in the area specified in Schedule 'A' attached, and Consignor further agrees to

sell to Consignee such products at the minimum prices Consignor authorizes for resale by Consignee to such customers, on the terms and conditions hereinafter set forth, and to purchase from Consignee without recourse, if properly assigned, accounts receivable, within limits approved, arising from sales by Consignee of such of the consigned products as he may purchase, to customers whose credit has been approved in writing by Consignor.

"2. Consignee agrees to:

"(a) Pay promptly Consignor, at Consignor's authorized minimum resale price, above specified, for all consigned products purchased by Consignee and to account promptly for all consigned products and any other money and property of Consignor in his possession, and to pay Consignor for any shortages which may develop at any time.

"(b) Make no sales of the consigned products except to the extent of his purchases thereof and then to sell such products only as his own and for his own account and risk to such customers within the specified area as he may select.

"(c) Sell such of the consigned products as may be purchased by him at not less than Consignor's authorized prices.

"4. Title to all products consigned and delivered to Consignee hereunder shall at all times remain in Consignor until they shall have been purchased by Consignee in accordance with the terms of this agreement."

The contractual relations existing between the defendant and Hudspeth remained the same until about the time of his induction into the service on April 24, 1944. He and the defendant, in contemplation of his probable induction, had negotiated for the purchase by the defendant of his equipment and for the cancellation of the lease on the bulk plant and of the "Bulk Plant Consignment Agreement." By agreement dated April 18, 1944, Hudspeth surrendered, cancelled and terminated his lease and "Bulk Plant Consignment Agreement" as of April 17, 1944, in consideration of the payment to him by the defendant of the sum of $800. Under date of April 24, 1944, he gave a bill of sale to the defendant of his Dodge truck and other equipment for $1,473.56.

The District Court found, in effect, that the relationship of Hudspeth to the defendant, at or about the time he was inducted into the service, was as indicated by the lease and the "Bulk Plant Consignment Agreement" as amended. This finding was obviously sustained by substantial evidence, although the finding was contrary to Hudspeth's contention that his relationship to the defendant after August 1, 1943, was in reality no different than it, had been under his prior "Commission Agency Agreement." His theory was, in substance, that the subsequent arrangement, made effective on August 1, 1943, was in the nature of window-dressing to enable the defendant to escape liability for social security taxes and the withholding of income taxes with respect to its Commission Agents and their employees, and was otherwise without effect.

The record shows that the purpose of the defendant in changing its contractual relations with Hudspeth on August 1, 1943, was to give him the status of an independent contractor or distributor, so as to avoid any obligation on its part to account for social security and other taxes with respect to him and his employees. The District Court found that the change was not made to escape any obligation of the defendant under the Selective Training and Service Act.

The findings of the District Court that the lease and "Bulk Plant Consignment Agreement" were made and were carried into effect by the parties, we think justified the court's determination that Hudspeth was an independent contractor at the time he terminated his relations with the defendant to enter the armed service. If, as the court found, Hudspeth was at that time an independent contractor, doing business for his own account, in his own way, on his own time, with his own employees and equipment, at the bulk station leased by him, selling to his own customers, and paying his own expenses of operation, he did not hold a position in the employ of the defendant. See Kay v. General Cable Corporation, 3 Cir., 144 F.2d 653, 654; Brown v. Luster, 9 Cir., 165 F.2d 181,

185; United States v. Silk, 331 U.S. 704, 719, 67 S.Ct. 1463, 91 L.Ed. 1757.

The District Court was under no misconception as to the applicable law. It based its determination that Hudspeth was an independent contractor on the principles announced by the Supreme Court in Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, 172 A.L.R. 317, and in United States v. Silk (Harrison v. Greyvan Lines, Inc.), 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757. If the truckers in the Silk case, who owned their own trucks, paid their own operating expenses, employed their own helpers, and were paid on a piece-work or percentage basis, were independent contractors, as the Supreme Court held (see page 719 of 331 U.S., page 1471 of 67 S.Ct.), it seems to us, as it did to the District Court, that Hudspeth was an independent contractor. The case of Brown v. Luster, supra, 165 F.2d 181 also supports the District Court's conclusion.

It is our opinion that the District Court did not err in determining that the plaintiffs in these cases were independent contractors. The judgments appealed from are affirmed.