KIRBY LUMBER CO. v. HENRY. †
(No. 5484.)

(Court of Civil Appeals of Texas. San Antonio. May 26, 1915. Rehearing Denied June 28, 1915.)

1. MASTER AND SERVANT ⬤⟿240—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

An employé of a lumber company, expressly or impliedly invited to ride on a logging train, sat on the tender while seeing signals to couple cars loaded with logs. A log on the car coupled to the tender was longer than the car, and when that car was backed into another car to be coupled, the log was pushed against the employé. He did not move from his place nor look up to see what was going on. *Held*, that he was guilty of contributory negligence as a matter of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 751–756; Dec. Dig. ⬤⟿240.]

2. APPEAL AND ERROR ⬤⟿1175—DISPOSITION OF CASE ON APPEAL.

Where a case was fully developed, and plaintiff could not recover, the court, on appeal from a judgment in his favor, will reverse it and render the proper judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4573–4587; Dec. Dig. ⬤⟿1175.]

Appeal from District Court, Hardin County; J. Llewellyn, Judge.

Action by John Henry against the Kirby Lumber Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Andrews, Streetman, Burns & Logue, of Houston, for appellant. V. A. Collins, D. E. O'Fiel, and F. G. Vaughn, all of Beaumont, for appellee.

CARL, J. Appellee, John Henry, sued appellant, Kirby Lumber Company, and recovered $5,000 on account of personal injuries sustained by him, as will hereinafter appear.

The substance of the allegations of the petition is well stated by appellant as follows:

"(a) That he was employed by the defendant in the capacity of a tramroad employé, and that it was his duty to clear off trams and keep stumps out of the way thereof for the purpose of the extension of such trams.

"(b) That all employés of the defendant were carried back and forth on the tram train of the defendant.

"(c) That by virtue of his contract under the rules and customs of the defendant company, he became entitled to transportation on defendant's tram train back and forth from his work.

"(d) That on account of long-established custom, he became entitled to transportation, not only out in the morning and back in the evening, but in the event of his ceasing work before the train which carried the employés in from work in the evening went in, he was entitled to be transported by the defendant's in-going trains, and in the event no other train was going in at such time, he was entitled to transportation on defendant's log train.

"(e) That on the day when he was injured, he completed at about the noon hour the work assigned to him for the day, and was told by his foreman to 'go over and catch that train and go in,' and that he went over to where one of the defendant's engines was standing on the tram-

road, and those in charge of said engine told him that if he was going in with them, to come and help wood up, whereupon he went around and began to throw wood up into the tender; those in charge of said train promising him that they were going into the mill almost immediately.

"(f) That after finishing wooding up, said engine backed down towards the mill to a switch, the plaintiff sitting on the front of the tender and his position being well known to the agents and employés of the defendant company operating said train, and that when said engine got down to said switch the engineer operating same pulled same out on said switch to couple up a load of logs and carry in to the mill."

"The plaintiff further alleged that after the first car was coupled up, the brakeman stepped out from between the said train and said tender, and the engineer on said train, without giving plaintiff notice of his intention to move said train, backed up with great force and velocity and ran the loaded car which had just been coupled to the tender against another loaded car with great force and velocity, and striking said other car with great force and impact; that on the car coupled to said tender and next to the one where plaintiff was sitting was a log of greater length than the car, and that when the engineer backed said car into said second car with such great force, said projecting log at the end of the car opposite where plaintiff was sitting struck the logs on the second car with such force that it pushed said projecting log on the first car with great force and violence back against the end of the tender where plaintiff was sitting, and without notice or warning to the plaintiff caught his leg between the said tender and the end of the log; and that the position of such projecting log was known to defendant's agents and servants, or by the use of ordinary care could have been known to them, and the dangers of backing such train with such force."

[1] Appellant interposed a general demurrer, as well as denying all the material allegations, and pleaded specially contributory negligence and assumed risk on part of appellee. It was also pleaded that Henry was neither required nor invited to take the position he did take on the tender which he was occupying when injured, but, on the contrary, he had been warned of the danger of so doing; that it was against the rules of the company to do so, of which Henry knew; that he had no duty to perform thereon, and was not expected, required, invited, or permitted to get upon the tender or ride thereon, and that no purpose of the defendant was being subserved by his being thereon at the time and place and under the circumstances of the accident in question; and that defendant owed him no duty in respect to the matters alleged in the petition.

At the conclusion of the evidence appellant asked the court to instruct the jury to return a verdict for the defendant, which was refused, and this is made the basis of the first assignment of error.

Appellee says that he had been working for the company about six months at Silsbee and two weeks at Evadale. He testified:

"My work was about four or five miles from the place where I boarded. * * * Every morning they would take all the men out in the car, and if you worked all day they would bring you back in the car, but if you knocked off before night, or they knocked you off, you would top the log cars. Once I knocked off before night, and I went in on the log cars, and there was no objection raised. * * * My work was cutting right of way. * * * There was not but two of us cutting right of way. * * * There was five or six men working there, but only two of us cutting right of way. * * * There wasn't but one man that worked directly with me, and his name was Ely White. * * * We got through Saturday. About 12 o'clock. * * * We got through about noon, and he [the foreman] told us to take the tools and take them to the lot and catch the log train and go in. I never did ride on that log train before that day. * * * When we got to the lot the log train was not there, we didn't see it, but the teamsters had quit work and I seen some of them running through the trees, and I told Ely, 'We had better walk up, that train is going to leave us,' and he said, 'It always blows,'" etc., "and we went on around the curve, and the engine was there wooding up, and Henry McGill was with me then, and I asked him which way the train was going, and he said he didn't know, and by that time the fireman looked around and seen me and said, 'Boys, wood up and I will take you on in,' and the brakeman said, 'Yes, everybody wood up,' and the engineer looked around and said, 'If you want to go in, you will have to wood up.' After we got wooded up he said, 'Let's go,' and we went up the main line about a half a mile. * * * The engineer saw me when I got on the train—on the tender of the engine. I had been riding on the same place where I got hurt all the time I had been working there when I was going to and coming from the woods. * * * They would bring us in from the woods on a light shay engine. * * * In going out I always rode on this same place, and they had the same crew. * * * When I took my seat on the tender the engineer and fireman were right there and saw me when I took my seat. * * * Then we started to the mill and went about a mile and one-half, and we had five empty cars behind and they uncoupled them and left the five empties on the main line, and Henry and Ely was on the empty cars. * * * After they cut in on the switch they went down to the loaded cars; don't know how far they were from the switch, I guess about a mile; it was a long ways down there; it was the first time I had been down there, and it seemed like a mile to me, might not have been quite so far, but they were just going a splitting and I had not got through eating when we got there. When we got to the loaded cars the brakeman came around behind and stood on the apron with me. * * * When we got to them he coupled the train up. I was about as close to the first car load of logs as the length of this table (about three feet), and I could see them all right, and the ends of the logs on that car were smooth and shapely and in good order. I could not see the other end of the car because the logs were stacked too high. * * * I could not see any danger from that load of logs, couldn't see any more danger than I see now.

"When the engineer made the first coupling, he just backed up to the next one to make the second coupling, but he did not ring the bell or blow the whistle. I could not see the brakeman at the time the train began to back up; I looked for him, but couldn't see him; he got away from me. I wanted some water, and I looked to see how far the loaded car was from us, and I aimed to get up, and just as I started to get up the engine went back, and I caught hold of a piece of iron, and before I could recover the log shoved in and mashed my leg and I jumped off. That log shoved back, I will say, four or five feet before it struck my leg; it just shoved back there, and caught my leg in between it and the tender of the engine. Before it slipped back my leg was four or five feet from the end of the log. The whole bunch of logs that were on the car were that far from me. There wasn't but one log that shoved back, and that was the one that

caught my leg in between it and the tender and mashed it. * * * I have always been a strong, robust nigger, and able to do good work. * * * The car next to me struck the other car with such force that the second car was running down the track when I saw it—it did not make a coupling. * * * I did not know that the train was going to back up and make another coupling; I thought it was going to stand still. * * * When I first got on the tender that day there was five empties hooked to the engine. Henry McGill and Ely White also got on when I did, and two more fellows, white fellows, besides the train crew. Ely got on the flat car, the last car, and Henry was on the first car right facing me. There was no one on the tender back where I was; I was the only one that got on there. I had rode on that tender before that in going out to the woods.

"In going out the train would be made up of nothing but empties, taking the men out. I never rode on that tender before with a loaded log car hooked on to it, we didn't take logs to the woods, we brought them out of the woods. * * * Henry and Ely stayed there at the switch, I reckon, I left them there. When the engine started down that switch track a mile in the opposite direction from Evadale, I stayed on the tender and went along. I didn't know where the engine was going, but the engineer told me it would be back there in 15 minutes, but I didn't know where it was going. * * * I knew that the engine had been uncoupled from the empties, and that Henry and Ely was left, but I didn't get off the tender and stay with them. * * * When the train backed down that switch I was sitting on the front end of the tender, and when we got to the loaded cars I could see them. * * * I was eating my dinner and could see the cars, but did not pay no special notice to them. * * * I didn't notice them until after I got hurt. * * * When the tender was backed up to the first log car, I still sat there in the same place, I didn't move; I wasn't afraid; the brakeman was standing right side of me, and he reached over me and got the pin and then got down in between fixing to make the coupling. I didn't get down out of the way, I just sat there and never got up at all. * * * I started to eating when they started to back in on the switch. I was paying attention to what was going on, but there was nothing on the track for me to be looking at. The brakeman rid there with me about 100 yards; he was standing up and he give them the slow signal, the back-up signal, and when we got there he coupled up. * * * The logs on the first loaded log car were higher than my head. * * * I don't know how high it was from the top of the wood on the tender, but the tender is higher than my head, and then the wood was piled up on it about a foot high. I couldn't see the engineer or fireman from where I was sitting. * * * In order to see either one of them I would have had to stand up, but I couldn't see over the top of the wood on the tender by standing up. * * * I stood up when I asked the fireman for a drink of water; I could see the fireman from where I was standing, but I was not looking over the wood, I was looking around the corner of the tender. * * * The load of logs on the front car was higher than my head."

The train crew testified, in substance, that it was customary in handling log cars, loaded, sometimes to butt them; that is to say, if the logs were not far enough over the edge of the car, or not straight, they would back in and make the coupling so as to butt the car or jar it and thus slip the logs over. All of them, engineer, fireman, and brakeman, testified that they did not know Henry was on the tender, that they had ordered them off before, and that all of them got off, as they thought, and that it was against the rules of the company for them to ride on the tender. They deny telling appellee he could ride in, and say that the company only permitted them to haul employés in on a train provided for that purpose. They admit, however, that they asked appellee and the other negroes to help "wood up," by which term they meant to load the tender with fuel wood.

Putting the most favorable construction upon appellee's case, from his standpoint, he got upon the tender in a most dangerous place and sat there eating his dinner when he knew the character of work that was being done by the train crew. Even if it be conceded that he was invited to ride in, as he says he was, or if that invitation be implied from the custom of permitting the laborers to ride in to the lumber village on these trains, still he is not relieved of his duty to exercise the ordinary faculties of a reasonable being, and if he had done this, he must necessarily have known that his position was one of extreme peril. He saw the signals given to back up to make the coupling, he says the brakeman came and reached over his legs to make the couplings, and yet he did not move; says he was not afraid, and continued to eat his dinner, not even looking up to see what was going on. If the surroundings did not suggest to him that he was in a place of danger, then we cannot conceive of anything short of an earthquake that would bring into play those faculties every reasonable being is supposed to possess. He evidently prized his dinner more than he did his own safety. And when a man shows such a reckless disregard for his own safety, he has no right, either in law or good conscience, to expect others to pay the penalty of his folly. No necessity is urged in justification of his position on the tender of that engine, but the undisputed evidence shows that it was not necessary for him to be there. He sought to make the excuse offered in the case of Tower Lumber Company v. Brandvold, 141 Fed. 920, 73 C. C. A. 153, to the effect that he did not know the danger of the situation. The answer given by the court in that case was as follows:

"The evidence, in our opinion, conclusively shows that he voluntarily and needlessly exposed himself to danger; that he took a position upon the logging car full of obvious peril. Any unusual jolt or mishap, in the nature of things and according to common experience of mankind, would have dislodged him from his perilous position and subjected him to injury. He was a full-grown man and presumably possessed of common intelligence. By the use of his own senses, even the instinct which prompts men of ordinary prudence to self-protection, he should have realized his danger and abandoned his rash and foolhardy action. In these circumstances he cannot excuse his carelessness, as he attempts to do in his evidence, by saying he did not know or appreciate the danger of the situation. Tuttle v. Milwaukee Ry. Co., 122 U. S. 189 [7 Sup. Ct. 1166], 30 L. Ed. 1114; King v. Morgan, 109 Fed. 446 [48 C. C. A. 507]; St. L. Cordage Co.

v. Miller; 126 Fed. 495, 513 [61 C. C. A. 477, 63 L. R. A. 551], and cases cited."

In the case of G., C. & S. F. Ry. Company v. Lovett, 74 S. W. 570, it appeared that the plaintiff was riding upon the footboard of the engine. He was not a passenger, but was a licensee to whom the duty of ordinary care was owing. The contention was advanced that in riding upon the footboard of the engine he was guilty of contributory negligence as a matter of law. His claim was that he had been thrown from the footboard of the engine by reason of a sudden check, jolt, and jar thereof which caused him to lose his balance and fall and be run over. The Court of Civil Appeals (Judge Neill), in passing upon the question, approved the following doctrine:

"The nature of the accident should be considered; and if, upon such consideration, it appears that the danger or injury from that particular accident was materially increased by the fact that the passenger was in that particular place, instead of the place he should have occupied, he ought not to recover. But if the nature of the accident be such that the danger of injury was not enhanced in consequence of the position occupied by the passenger, or if the accident was of such a nature as was as likely to occur in one position of the train as another, his right to recovery will not be affected by the fact that he was in an improper place."

After discussing numerous authorities in support of the ultimate position taken by the court that Lovett was guilty of contributory negligence as a matter of law, the court said:

"The place that plaintiff voluntarily selected to ride placed him in such obvious peril from such an accident as by his own testimony he claims to have encountered, as to constitute contributory negligence, as a matter of law, and should preclude his recovery even though negligence on the part of defendant were shown."

In the Burns v. Chronister Lumber Co. Case, 87 S. W. 163, where the plaintiff had taken a position on the pilot of an engine, and claimed to have been injured through the negligence of the operatives of the train in causing a sudden lurch throwing him off, Judge Pleasants, speaking for the court said:

"Plaintiff was 25 years old, and there is no evidence that he was not possessed of ordinary intelligence. The evidence above stated conclusively shows that a proximate cause of plaintiff's injury was the insecure and dangerous position which he had voluntarily taken upon the engine, and we are of opinion that his taking this position upon the pilot of the engine, under the circumstances shown by the evidence, was an act so opposed to the dictates of ordinary prudence that reasonable minds can reach no other conclusion than that it was negligent. Railway v. Clemmons, 55 Tex. 88 [40 Am. Rep. 799]; Rucker v. Railway, 61 Tex. 499; Wilcox v. Railway [11 Tex. Civ. App. 487], 33 S. W. 379; Railway v. Jones, 95 U. S. 439, 24 L. Ed. 506; Kresanowski v. Railway (C. C.) 18 Fed. 229."

In the Wilcox Case, referred to by Judge Pleasants, the plaintiff was riding upon the footboard in front of the engine. Judge Williams wrote that opinion, and he said, in part:

"But the principles declared in these cases do not authorize a recovery by one injured by the mere negligent running of the engine when, at the time of the injury, he is, without right to be there, in a situation where his mere presence is negligence; and such, we think, was appellant's situation when he was hurt."

It is unnecessary for us to consume space in quoting further what courts have said. The following authorities amply sustain this view, and the assignment is sustained: B. P. Ry. Co. v. Jones, 95 U. S. 439, 24 L. Ed. 506; Ft. Worth, etc., Ry. Co. v. Anderson, 118 S. W. 1113; K. C., etc., Ry. Co. v. Williford, 115 Tenn. 108, 88 S. W. 179; S. L. & S. W. Ry. Co. v. Rice, 9 Tex. Civ. App. 509, 29 S. W. 525; T. & P. Ry. Co. v. Boyd, 6 Tex. Civ. App. 205, 24 S. W. 1086; St. L. & S. F. Ry. Co. v. Schumacher, 152 U. S. 78, 14 Sup. Ct. 479, 38 L. Ed. 361; Tower Lumber Co. v. Brandvold, 141 Fed. 920, 73 C. C. A. 153; Williams v. Choctaw, etc., Ry. Co., 149 Fed. 105, 79 C. C. A. 146; St. L., etc., Ry. Co. v. Conway, 156 Fed. 234, 86 C. C. A. 1; Radley v. Columbia, etc., Ry. Co., 44 Or. 332, 75 Pac. 213, 1 Ann. Cas. 447; Glover v. Scotten, 82 Mich. 369, 46 N. W. 936; Labatt, Master & Servant (2d Ed.) vol. 3, § 1250, subd. 7, and cases there cited.

[2] Since the case was fully developed and the plaintiff under the facts could not recover, the judgment of the lower court will be reversed, and judgment is here rendered that appellee recover nothing by this suit.

Reversed and rendered.