DALE E. BARKER ET UX V. COASTAL BUILDERS, INCORPORATED

No. A-4324. Decided June 23, 1954.
Rehearing overruled October 20, 1954.
(271 S.W. 2d Series 798)

*Masterson, Williams & Smith* and *Fred L. Williams,* of Angelton for petitioners, Dale E. Barker and wife.

The Court of Civil Appeals erred in holding that the statute of limitation of four years would not operate as a bar to an action to reform the deed to the Martins; and in holding that the evidence established as a matter of law that a mutual mistake occurred in the deed from Coastal Builders to the Martins. Pure Oil Co. v. Rose, 131 Texas 41, 111 S.W. 2d 1076; Moore v. Gieseke, 76 Texas 543, 13 S.W. 290; Pegues v. Dilworth, 134 Texas 196, 132 S.W. 2d 582.

*Sam G. Croom,* of Houston, for respondent, Coastal Builders.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

The respondent brought suit in the District Court of Brazoria County, Texas, against petitioners wherein it sought to remove a cloud from its title to a strip of land 30 ft. x 40 ft. located in the northeast corner of the east half of lot 8, Block 161, Dow's First Addition to the town of Freeport, Brazoria County, Texas, (hereinafter designated the E. 1/2 of Lot 8). It was alleged that through mutual mistake this strip had been included in a warranty deed from Coastal Builders, Inc. (hereinafter called Coastal) to W. K. Martin and wife, conveying the E. 1/2 of Lot 8, but that Coastal had remained in possession of such strip at all times since the execution and delivery of the deed,

using and enjoying the same and the improvements situated on such strip; that the Martins and their grantees had acquiesced in the use and claim of title by Coastal to such strip, and all parties had notice of the title claimed by Coastal, and no grantee was an innocent purchaser.

Petitioners were grantees under a warranty deed containing no exceptions or reservations, executed by one S. B. Grisham, et ux. The Grishams were the Martins grantees under warranty deed containing no reservations or exceptions. Respondent prayed for judgment removing the cloud cast upon its title by filing of the deeds containing no reservation of the strip, and further prayed for judgment correcting and reforming the deed from the Grishams to respondent so as to give full legal effect to the alleged original agreement between respondent and the Martins and to adjudicate the legal and equitable title to the 30 ft. x 40 ft. strip in respondent.

Petitioners filed an answer containing a general denial, a plea of "not guilty," that the cause of action for reformation was barred by the four year statute of limitation; a count in trespass to try title, and other pleadings not necessary to mention. Upon the trial of the case before a jury, judgment was rendered against respondent, and in favor of petitioners on their cross-action for title and possession of the strip. On rehearing that judgment has been reversed and remanded by the Court of Civil Appeals at Galveston upon the ground that the mistake was proved as a matter of law, and that the action was not barred. 259 S.W. 2d 591.

The Barkers, in their application for writ of error, say that the Court of Civil Appeals erred in holding that the evidence established as a matter of law that there was a mutual mistake in the description of the premises contained in the deed to Martin and wife. We sustain this assignment.

■ Petitioners having secured a jury finding in answer to Special Issue No. One that no oral agreement was made between Coastal and the Martins to reserve the strip in question, it follows there was no mistake in the warranty deed whereby Coastal conveyed the E. 1/2 of Lot 8 to the Martins without any exceptions or reservations. In considering the evidence to determine whether there is evidence to support the jury's answer to Special Issue No. One, we must consider that evidence most favorable to the Barkers, as they were the party prevailing in the trial court. Blanks v. Southland Hotel, 149 Texas 139, 229 S.W. 2d 357;

Hickman v. Hickman, 149 Texas 439, 234 S.W. 2d 410; Renfro Drug Co. v. Lewis, 149 Texas 507, 235 S.W. 2d 609, 23 A.L.R. 1114; Schiller v. Elick, 150 Texas 363, 240 S.W. 2d 997.

The record shows that Coastal was at all times wholly owned by Mr. H. F. Twombly who resided in Freeport, Texas and Mr. W. M. Dickey, who resided in Houston, Texas. Mr. Twombly handled the transaction for the sale of the property to the Martins, and Mr. Dickey testified that he never had any conversations with the Martins concerning the reservation in the contract, nor did he have any correspondence with either of them about this matter prior to the execution of the deed. In fact, he had no personal dealings with the Martins. The Martins were not present when instructions were given Mr. Kerr, an official of Gibraltar Savings & Building Association (hereinafter called Gibraltar), to reserve the plat from the conveyance of the E. 1/2 of Lot 8, and Mr. Dickey could not swear whether the instructions to reserve the tract were given prior to or subsequent to the signing of the purchase contract with the Martins. Mr. Twombly testified that he never had any written agreement with the Martins regarding the reservation; that all negotiations with the Martins about this were oral and were some two or three weeks prior to the sale of the lot to the Martins; that the last dealings he had with the Martins was when they signed the application to Gibraltar to be used by Gibraltar to secure the acceptance by FHA of the Martins as payee on the $3,650.00 loan Coastal had secured from the FHA on the E. 1/2 of Lot 8. He further testified that the FHA had reduced the amount loaned on this Martin tract because of the reserved strip. The correspondence with FHA shows the loan was made for $3,650.00 and covered the whole of the E. 1/2 of Lot 8, without any reservations. He further testified that his oral agreement with the Martins could have been changed prior to the execution of the contract of sale and the deed. The record further shows that sometime prior to July 10, 1942, Coastal had made an application for a loan to Gibraltar on the E. 1/2 of Lot 8 without any reservation. Mr. Dickey testified "our agent for the financing (of these houses) was Gibraltar Savings & Building Association in Houston," and that James H. Kerr was the official of Gibraltar with whom they did practically all the financing. Generally the business was handled in the following manner: Coastal would apply for a loan on a particular tract of land through Gibraltar. Gibraltar would apply to FHA for insurance on the loan. After approval of the loan by FHA, Coastal would secure a purchaser for the land after agreed improvements had been erected on the land sold. Coastal would proceed to build the desired improve-

ments. At the time a purchaser was secured, he would sign an application to Gibraltar which was to be used to secure FHA's approval of the purchaser as the borrower in place of Coastal. Gibraltar would send in the application, and as soon as FHA notified Gibraltar it would accept the proposed purchaser as its debtor upon completion of the agreed improvements, the purchaser would move in. FHA had made a final inspection prior to the purchaser moving in. When the improvements were completed and the purchaser moved in and paid a certain amount in cash (in our case $675.00), Coastal was released from liability on the loan, and the purchaser became liable.

In our case the first approval was given prior to July 10, 1942. On that date Coastal executed the necessary loan papers to Gibraltar for $3,650.00 on the E. 1/2 of Lot 8. There were no exceptions in the deed of trust securing the loan or any other papers. On that date Kerr of Gibraltar wrote FHA a letter as follows:

"It appears that at the time the application on this loan was filed there was a tool house situated on the back thirty feet of this lot. This application was filed with a great many others in a rush here and in filing the application we made the same cover the full area of the lot, making no exception as to the back thirty feet. However, the lot plan submitted at that time did show this situation.

"The Avalon Construction Company are requesting that we write you in connection with this matter and ascertain if the values as shown would permit you to substitute for the present commitment, *which covers the full area of the lot,* a commitment of like amount excepting therefrom the back thirty feet of said lot. *If this cannot be done without a reduction in the commitment please advise us.* Also advise us if the commitment is left as is and the loan is closed in the name of Avalon Construction Company for the amount of the present commitment and they should sell this property to some prospective purchaser, what effect would it have on a later substitution of this purchaser for the Avalon Contruction Company if they should exclude the back thirty feet from their deed to said purchaser? If this cannot be done, advise us if it will be possible for them to remove said tool house from the property without affecting the commitment in any manner." (Emphasis added)

The Avalon Construction Company referred to in the above letter was another corporation wholly owned by Dickey and Twombly and through which corporation they also built and sold

houses in Dow's First Addition to the town of Freeport, Texas. The identification number on the letter and the reply below show the correspondent had reference to the loan on the E. 1/2 of Lot 8. On July 13, 1942, FHA, by A. C. Ford, District Director, wrote Gibraltar:

"Reference is made to your letter of July 10, concerning the existence of a tool house at the rear of this property.

"The exclusion of a 30-foot strip at the rear of this property would not be desirable. *The valuation ascribed in this case was made on a typical lot and this 30-foot strip is an integral part of the typical lot.*

"In answer to the question in the second paragraph of your letter, *if the builder should exclude this 30-foot strip in a sale of the property the proposal for substitution of borrower would not be acceptable.* It will be necessary that this tool house be removed from this property." (Emphasis added)

On July 16, 1942, Coastal, acting by W. M. Dickey, and the Martins executed a contract of sale (which the evidence shows was drawn by someone working for Gibraltar) to the E. 1/2 of Lot 8, containing no reservations and exceptions. The Martins agreed to assume the $3,650.00 loan, and to pay some cash and execute a small note. On August 1, 1942, Coastal, by W. M. Dickey, president, and under its corporate seal and signature of its assistant secretary, made and executed to W. K. Martin and wife, Elizabeth, its general warranty deed conveying the E. 1/2 of Lot 8 without exception or reservation (save a vendor's lien to secure payment of a note for $375.00). This deed also recited the cash payment of $300.00, the $375.00 note and the assumption of the $3,650.00 note, as described in the deed of trust securing same, and identifying this deed of trust as the one of July 10, 1942 referred to above. Coastal and other corporations owned by Dickey and Twombly continued to use the garage on the claimed reserved space. However, there is evidence that the approach to the Martins' garage was improved by Coastal and that it ran across one end of the disputed strip. This driveway has been used by the owners of the dwelling on the E. 1/2 of Lot 8 at all times since the Martin's had moved into their premises. W. K. Martin signed an application to Gibraltar for a loan on the E. 1/2 of Lot 8, without any reservations or exceptions. The date of this application is not shown by the record, but it evidently was about July 10, 1942, or shortly thereafter—the date FHA approved Coastal's application for the $3,650.00 loan and the date Coastal executed the closing papers on that loan. On the last page of this application and some inch

below Martin's signature to the application is a notation in Mr. Twonbly's handwriting "This is a short lot—Block 161." Coastal never rendered the land for taxation or paid any taxes thereon after the sale to Martin.

Mr. Twombly testified that as a part of each transaction when there was a side note attached (the $375.00 note herein) he made out and filled in a mimeographed memorandum which went to Gibraltar and which stated the terms of the contract to be made between Coastal and the purchaser; that he sent in such written memorandum in the Martin transaction and that this memorandum showed the property to be the E. 1/2 of Lot 8, and that was the description he gave them of the property. On September 28, 1944, Coastal, acting by Harry F. Twombly, vice-president, and its secretary, executed a release to W. K. Martin, et ux of the $375.00 note described in the warranty deed to the Martins. This release described the property as the E. 1/2 of Lot 8 and contains no reservations or exemptions. At the time of the trial of the cause there was evidence that the Martins had removed from Freeport about July 27, 1946, the date they deeded the property to S. B. Grisham. There is no evidence as to the whereabouts of the Martins, and they did not testify, either in person or by deposition. Grisham was dead at the time of the trial, but Coastal introduced (without objection) his testimony given in a forcible detainer suit brought by Barker against Twombly. By this reproduced testimony Grisham testified that he asked Martin if he owned the garage or not (the garage on the purported reservation) and "he said yes, he had a deed to it." Also Grisham testified that Martin did not tell him Coastal or someone was claiming the title to the garage, but that Martin told him "they were using it," and that Martin said Twombly was claiming an error in the deed.

There was introduced in evidence, without objection and quoted from by both parties in their briefs, a letter from an attorney who had been consulted by Mr. Grisham regarding his title to the property in dispute. In this letter it is stated, among other things, that Mr. Twombly had furnished the attorney with photostatic copies of correspondence between Mr. Martin and Coastal through its attorney. The first of these letters was from Martin addressed to Coastal and dated February 1, 1945, requesting that the garage on the strip be vacated and stating that Avalon Construction Company had been using this garage for storage for some time past. The reply from Coastal's attorney to Mr. Martin stated that this garage was to have been excepted and reserved, and that it was a pure oversight that the deed did

not contain such reservation. This letter further stated Coastal owned the strip and garage thereon, and that it was not covered by "the contract of sale between Martin and that company" and that he was not entitled to have the garage removed. In reply, Martin wrote Coastal stating that in discussing the purchase of the property with Mr. Twombly it was mentioned that the land on which the garage was located was to be reserved but that he was not shown any plat showing any reservation to be made, and that when his (Martin's) deed and title insurance policy were delivered with no reservation he believed that no reservation was meant to be made, and that no reduction was made in the price. The originals of these letters were not introduced in evidence.

All the testimony regarding the oral agreement to reserve the plat comes from Mr. Twombly, as does the testimony as to the reduction in the purchase price. The testimony as to the reservation is contradicted by each and every written instrument in the record affecting the transaction. There is no dispute in the record that all the written instruments concerning the title were entered into at a later date than the oral discussions. Mr. Twombly is an interested party. The rule as to the testimony of an interested witness is stated in Flack v. First National Bank of Dalhart, 148 Texas 495, 226 S.W. 2d 628, 633 wherein we quote from the case of Texas Employers' Ins. Ass'n. v. Roberts, 135 Texas 123, 139 S.W. 2d 80 as follows:

" 'As to the testimony of interested witnesses, the general rule is that, while the jury has no right arbitrarily to disregard the positive testimony of unimpeached and uncontradicted witnesses, the mere fact that the witness is interested in the result of the suit is deemed sufficient to require the creditability of his testimony to be submitted to the jury. Stated in another form, the rule is that the uncontradicted, uncorroborated testimony of a party to a suit will not authorize or support an instructed verdict.' Simmonds v. St. Louis B. & M. Ry. Co., 127 Texas 23, 27, 91 S.W. 2d 332, 333; Pope v. Beauchamp, 110 Texas 271, 280, 219 S.W. 447; Sonnentheil v. Christian Moerlein Brewing Company, 172 U. S. 401, 19 S. Ct. 233, 43 L. Ed. 492, 495; Mills v. Mills, Texas Com. App., 228 S.W. 919; Burleson v. Tinnin, Texas Civ. App., 100 S.W. 350, application for writ of error refused; Traders & General Insurance Co. v. Milliken, Texas Civ. App., 87 S.W. 2d 503, 505.

" 'The plaintiff's testimony, the substance of which has been hereinbefore stated, is not so clear, positive and unequivocal upon the point at issue and of such nature and given under such

circumstances as to bring it within the exception to the above quoted rule and authorize the trial court to give conclusive effect to it. Great Southern Life Insurance Company v. Dorough, Texas Civ. App., 100 S.W. 2d 772, 775, 776; Springfield Fire & Marine Insurance Company v. Wm. Cameron & Company, Texas Civ. App., 96 S.W. 2d 788; Simonds v. Stanolind Oil & Gas Company, 134 Texas 332, 114 S.W. 2d 226, Id., 134 Texas 332, 136 S.W. 2d 207, 208; Traders & General Insurance Co. v. Milliken, Texas Civ. App., 87 S.W. 2d 503, 505.' Texas Employers' Ins. Ass'n. v. Roberts, 135 Texas 123, 139 S.W. 2d 80, 85."

We do not believe that the testimony of Mr. Twombly comes within the exception to the above rules. McGuire v. City of Dallas, 141 Texas 170, 170 S.W. 2d 722, 728.

There beling no mistake in the deed to the Martins, the respondent is met with the well-known and universal rule that prior oral agreements are merged in later written instruments. Woods v. Selby Oil & Gas Co., 2 S.W. 2d 895; affirmed, Texas Com. App., 12 S.W. 2d 994; Tate v. Tate, Texas Civ. App., 15 S.W. 2d 159, (6, 7, 8), reversed on a different independent holding, Texas Com. App., 27 S.W. 2d 137; Jones v. Risley, 91 Texas 1, 32 S.W. 1027.

The judgment of the Court of Civil Appeals is reversed and that of the trial court affirmed.

Opinion delivered June 23, 1954.

MR. JUSTICE WILSON concurring.

I do not believe there is a fact issue here. To me the controlling question is whether an action to reform and correct a deed is barred by the four year statute of limitation.

The mutual mistake is that the rear portion of a city lot (upon which the developer of the addition had his work sheds) was not excluded from the description of the lot at the time the developer sold the front portion. This suit was not filed until more than four years after the discovery of the mistake.

The Court of Civil Appeals recognized this as an equitable cause of action to reform but held the four year statute of limitation[1] not applicable because the grantee "acquiesced in

---

1. Art. 5529, R.C.S. 1925. "Every action other than for the recovery of real estate, for which no limitation is otherwise prescribed, shall be brought within four years next after the right to bring the same shall have accrued and not afterward."

the claim" and the grantor had "at all times remained in possession" and used the tract. Grantor seeks to sustain this ruling also on the ground that the superior equitable title remained in him and that he is the beneficiary of a constructive trust.

If the grantor parted with title under a mutual mistake, then all that he had left was a cause of action to reform. In the absence of reformation, he would have no title of any kind because as long as the deed stood unreformed it operated to pass all of his title. Hamilton v. Green, 166 S.W. 97. To hold otherwise would be to raise various equitable rights to the dignity of unwritten land titles contrary to the policy of our law.

Does the wording of Art. 5529—"Every action other than for the recovery of real estate"—bring forward the old distinction between real and personal actions?

Formerly when equity and law were administered in separate courts a plaintiff in this situation could not file a possenssionary action at law until he had good title. Jones v. Johnson, 18 How (59 U. S.) 150, 15 L. Ed. 320; 76 C.J.S., Reformation of Instruments, §7, p. 332 and §67, p. 405. He would first have to file a separate suit in equity to reform the deed and in this would have had to meet and overcome a plea of laches. 76 C.J.S., Reformation of Instruments, §69c, p. 418. Although we have long since combined law and equity in one court, we have for many purposes adhered with some rigidity to distinctions between what were formerly legal and equitable actions,[2] and on that basis it is settled law in Texas that a suit to reform and correct a deed for mistake is not "for the recovery of real estate," but personal. McCampbell v. Durst, 15 Texas Civ. App. 522, 40 S.W. 315, 955; Id. 91 Texas 147, 41 S.W. 470; Cleveland State Bank v. Gardner, Texas Com. App., 286 S.W. 173; Pure Oil Company v. Ross, 131 Texas 41, 111 S.W. 2d 1076.

2. Hearst's Heirs v. Kuykendall's Heirs, 16 Texas 327; Hemphill:

"* * * An action for the recovery of lands has a well known and definite signification, and means an action of ejectment, trespass to try title, or a suit to recover the land itself; whereas the object of a suit by vendee, for specific performance, is not the recovery of the land itself, but to enforce a contract for its sale, and the delivery of a deed or title for the land. The vendee may be, and very often is, in possession of the land, and that by an equitable title superior in every respect to the shadow of legal title remaining with the vendor, but for convenience and security he may desire a conveyance in form, in accordance with the contract; and a proceeding for this purpose could not, in the ordinary ard legal acceptation of the terms, be described as a suit for the recovery of the land. To secure title deeds to land is one thing; to recover the land itself is another, and as the former is generally and mainly the object of a suit by vendee for the specific performance of a contract for the sale of land, it is apparent that the action does not come within the scope of a provision, the operation of which is restricted to suits for the recovery of the land."

Should continued possession by the grantor change such a suit to one "for the recovery of real estate"? Under the old divided jurisdiction, possession or lack of it would have made no difference in the right to bring a suit in equity to correct the deed. Of course, a resort to law to obtain possession would have been unnecessary under the facts of this case since grantor already had that. I see no reason under a blended system why continued possession by the grantor after discovery of the mistake should bar the operation of the statute. The policy of the law is that mistakes be corrected with reasonable promptness while the facts are fresh and the original parties to the transaction still available.[3] Four years is not an unreasonable period in which to take action to correct a known mistake. A diligent grantor should immediately request a correction deed. If this be refused, he knows that he must either be put to the expense of a suit or forget it. Acquiescence upon the part of the grantee is not a factor since he has neither burden nor incentive to correct the mistake.

The grantor here relies upon some of the language in Strong v. Garrett, 148 Texas 265, 224 S.W. 2d 471. In that case the grantor put the grantee in possession of the lot both had agreed upon but the deed contained the wrong tract number. Where the grantee suffering by the mistake is in possession, knowledge of the mistake will not be presumed but must be brought to his attention by adverse claim or disturbance of possession. In the Strong case the adverse claim was asserted within four years next preceding the filing of the suit. In the case at bar suit was not filed until more than four years after discovery of the mistake and assertion of adverse claim.

This rests upon the need for certainty in land titles. The undesirable situation arising from long continued failure to correct known mistakes has been the cause of the constant effort of the law to avoid long-standing unwritten land claims. Because this has proved to be a wise policy, we should adhere to the traditional classification of a suit to reform a deed for mutual mistake as being personal and therefore barred by Art. 5529.

Opinion delivered June 23, 1954.

MR. JUSTICE GARWOOD dissenting.

---

3. McCampbell v. Durst, 40 S.W. 315, 322, Williams:
"* * * To hold that this four years' statute of limitations does not apply would be to hold that there is no limitation to this kind of a suit, and that equities such as this are only barred by adverse possession, or else to say that the courts are still to have resort in such cases only to the doctrine of stale demand. * * *"

After granting the writ of error upon point that the action of the plaintiff-respondent was barred by the four-year statute of limitation, this being the first and primary one of the petitioner-defendant, we dispose of the case—incorrectly, I believe—upon the secondary point that the findings against (a) existence of an agreement to exclude the strip (and half of a garage building) in dispute and (b) the mistake of including the latter in the deed were supported by the evidence, contrary to the holding of the Court of Civil Appeals.

On the surface, the argument of the court's opinion is not unimpressive, but actually one can have little doubt that the mistake occurred. In fact able counsel for the petitioner rather obviously refrains from denying that the oral agreement between the original purchaser, Martin, and the respondent-plaintiff as vendor was actually made. He says "Undoubtedly, the matter was discussed with Martin" (the witness Twombly, who so testified, thus at least to that extent admittedly told the truth). And certainly, when we consider that the strip in question was but a continuation of a corresponding strip reserved more or less contemporaneously on the adjoining lot and that a single and quite substantial garage or tool building (antedating the garages forming part of the new residences on the respective lots) occupied the greater part of both strips, the reservation would be more natural than its absence. Why should the vendor sell *half* of a garage building at the extreme rear of a lot which already had a new whole garage? And why, if the reservation was not intended, would the vendor, less than two weeks later, expressly reserve the corresponding strip, including the other half of the garage building, in the sale of the adjoining lot? In the latter sale it is quite significant that the written contract, like the written contract with the Martins, omitted the reservation, whereas the deed, unlike the deed to the Martins, included the reservation. And why would the Martins, for some four years, and until they were selling the residence to Grisham in mid-1946, raise not even a question, much less a complaint, about the openly continued exclusive use and occupancy of the garage by the respondent-plaintiff, which the jury itself found to be by way of "acquiescense," there being no explanation such as a lease or license?

The statement that "the testimony as to the reservation is contradicted by each and every written instrument in the record affecting the transaction" sounds convincing. But naturally, every case of a mistake involves, in a sense, a contradiction between the instrument in question and the testimony of the

mistake, and if that sort of contradiction is evidence against existence of the mistake, so as to prevent the latter from being established as a matter of law, then, indeed, mistake is the one instance in all our jurisprudence, wherein the existence of facts can never be established as a matter of law. But in the sense which is appropriate to the actual situation, there is no contradiction between *any* instrument in the record and the erstwhile uncontradicted evidence of the mistake. The fact simply is that the same mistake was made not unnaturally in all of the instruments executed at or about the time of the sale, all or most of them having been drawn by Gibraltar which, as the lender in the transaction, was naturally more concerned with its own interests than those of anyone else save perhaps the F.H.A. The 1944 release by the respondent-plaintiff of the second lien "sidenote" of the Martins, being a mere release executed some two years after the sale, would naturally not be studied by the party executing it with reference to whether or not it mentioned a small reservation intended to have been made in the 1942 deed. Certainly Martin went on for two years after the release, acquiescing in the possession and use of the garage building by the releaser and never questioning the oral reservation until his 1946 negotiations with Grisham.

And there *are* documents (if not "instruments") which clearly point to the mistake. What of the drawings, covering both of the two lots in question and the improvements, which were sent to Gibraltar with the reservation clearly shown on the first pages respectively, shortly prior to the oral agreement between the Martins and Twombly? And what of the notation at the bottom of the credit report of Martin sent to Gibraltar about the same time stating, "This is a short lot?" Surely if Twombly told the truth to the extent the reservation was "discussed" with the Martins, as he admittedly did, we should also believe his testimony that this notation was made by him with the knowledge and in the presence of Martin. Not only that, but we have also the above-mentioned fact that the 1946 negotiations between Martin and his vendee, Grisham, first raised the question of whether Martin owned the strip in litigation or not and caused the interested parties to go to the deed. In view of the deed, why should there have been any question about the matter, unless Martin had made the agreement which Twombly swore he did? I recall not a word of evidence that anyone connected with the respondent-plaintiff said anything about its rights to the strip in the period between the execution of the deed in 1942 and the negotiations between Martin and Grisham in 1946.

Thert is, moreover, no contradiction of the testimony of Twombly and Dickey that the price in the sale to Martin and wife would have been $150.00 higher but for the agreement to reserve the strip in question; nor is there any contradiction of their corresponding testimony as regards the sale to the Walkers very shortly thereafter.

The petitioner-defendant argues principally that the dates of the admitted "discussion" of the reservation with Martin, the July 10, 1942 request (written by Gibraltar) to F.H.A. to modify the commitment so as to exclude the strip, the July 13th refusal of F.H.A., and the July 16th written contract of sale (describing the lot without any reservation) are such as to justify a jury inference that the F.H.A. refusal caused an abandonment by the respondent-plaintiff itself of any oral arrangement to reserve the strip and consequent execution of the contract without mention of such a reservation. In the light of all the evidence in the case, it seems to me that the circumstances of the sale of the adjoining lot to the Walkers conclusively refute the inference suggested. The written sales-contract form signed by the Walkers (it was not signed by the vendor) on July 25th, 1942, or some nine days after the Martin contract, likewise made no reservation (of the corresponding strip on which the east half of the garage building was located). It seems clear from the evidence that the terms of the F.H.A. commitment in that instance, too, failed to mention any reservation. Presumably the deed of trust from the respondent-plaintiff on the Walker lot also failed to mention it. And yet the August 13th deed to the Walkers, executed only twelve days after the deed to the Martins, contained the reservation. As before suggested, why should a vendor thus reserve a mere half of a garage building and the corresponding strip, if he had consciously parted already with the other half and corresponding strip on the Martin lot?

As to the main point in the case, doubtless there is little reason now to discuss it fully, although it is both of importance and interest. The test of whether the four-year statute bars the respondent-plaintiff is, of course, whether it is seeking to enforce an equitable *title* or, by court decree, to convert a mere equitable right of reformation into an equitable title. What the action may be denominated by the pleader—whether reformation, removal of cloud, trespass to try title or otherwise is not material. The nature of the right in question is what counts.

This is quite clear from long-standing decisions of our court, both those holding the statute applicable (e.g. McCampbell v.

Durst, 15 Texas Civ. App. 522, 40 S.W. 315, wr. of error dism. for want of juris., 91 Texas 147, 40 S.W. 955; Cleveland State Bank v. Gardner, Texas Com. App., 286 S.W. 173, and those holding it inapplicable (e.g. Gilmore v. O'Neil, 107 Texas 18, 173 S.W. 203; The Texas Company v. Davis, 113 Texas 321, 254 S.W. 304; Thomason v. McIntyre, 113 Texas 220, 254 S.W. 315; State Mortgage Corp. v. Ludwig, 121 Texas 268, 48 S.W. 2d 950, 955.)

The difficulty in this aspect of the case has arisen from a slight misinterpretation of the language of decisions such as the State Mortgage Corp. case, in which it was said that, "Defendants in error and their ancestor, having continued in actual possession of the lots, their suit was not barred by the statute of limitations." See also Payne v. Ross, 10 Texas Civ. App. 419, 30 S.W. 670; Howard v. Young, Texas Civ. App. 210 S.W. 2d 241, wr. of er. refused "no reversible error," and Strong v. Garrett, 148 Texas 265, 224 S.W. 2d 471. The Court of Civil Appeals evidently, and in my opinion erroneously, considered these decisions as authority for the proposition that, where the party seeking reformation or cancellation happens to be in possession of the land involved, that fact alone will defeat application of the four-year statute, even though the possessor should have no equitable or legal title, but merely an equitable right.

Such a view appears unjustified in the light of the decisions first above cited. Justice Greenwood wrote the opinion in the State Mortgage Corp. case as well as that in The Texas Company v. Davis, which he cites in the former immediately following the language above quoted. He also wrote Thomason v. McIntyre, supra, in which he carefully explained The Texas Company case as requiring a *title*, legal or equitable, in order that the "owner" of the land might not be barred by the four-year statute in his action apparently involving reformation or some other equitable remedy. As shown in Gilmore v. O'Neill, supra, the matter of possession is important in such cases only as a circumstance bearing on the question of title. The situation is somewhat analogous to that wherein the validity of a parol transfer of land is influenced by matter such as transfer of possession and the making of improvements. See Hooks v. Bridgewater, 111 Texas 122, 229 S.W. 1114, 15 A. L. R. 216. The matter of equitable title as related to the four-year statute is also dealt with in trust cases such as Binford v. Snyder, 144 Texas 134, 189 S.W. 2d 471, and McDonald v. Follett, 142 Texas 616, 180 S.W. 2d 334,

as well as in specific performance cases such as Johnson v. Wood, 138 Texas 106, 157 S.W. 2d 146.

But in the instant case, while the possession of the respondent-plaintiff alone would not protect it from the bar of the statute, the mistake, plus the fact that in effect no consideration was paid by the Martins for the strip in question, plus the retention and maintenance of possession, does raise a serious question of equitable title in the respondent-plaintiff as distinguished from a mere equitable right of reformation. The question is a close one and, of course, there is lacking the element of improvements, so important in statute of frauds cases. However, I think the facts afford sufficient basis to support the claim of equitable title and that the otherwise applicable four-year statute does not control.

I would affirm the judgment of the Court of Civil Appeals. Opinion delivered June 23, 1954.

## ON MOTION FOR REHEARING.

PER CURIAM.

In its motion for rehearing respondent points out that in its brief in the Court of Civil Appeals it presented by separate assignments both the point that there was no evidence warranting the submission of Special Issue No. 1 to the jury and the point that the finding of the jury in answer to that issue was against the overwhelming preponderance of the evidence. Since the latter point presents a question of fact, this court is without jurisdiction to decide it. The finding by the Court of Civil Appeals that there was no evidence warranting the submission of Special Issue No. 1 includes the finding that the answer of the jury thereto was against the overwhelming preponderance of the evidence, or, as frequently stated, that the evidence was insufficient to support the finding. The established rule of practice in such cases, when this court decides that the Court of Civil Appeals erred in reversing and rendering the case on the ground of no evidence, is to reverse the judgment of that court and remand the case to the trial court for a new trial. Lowry v. Anderson-Berney Building Co., 139 Texas 29, 161 S.W. 2d 459; State v. Birdette, 139 Texas 357, 162 S.W. 2d 932; State v. Gray, 141 Texas 604, 175 S.W. 2d 224; Bowman v. Puckett, 144 Texas 125, 188 S.W. 2d 571; Najera v. Great Atlantic & Pacific Tea Co., 146 Texas 367, 207 S.W. 2d 365; Hopson v. Gulf Oil Corp., 150 Texas 1, 237 S.W. 2d 352.

The Court of Civil Appeals reversed and remanded this case on another point. Its judgment should, therefore, be affirmed. It is accordingly ordered that the judgment heretofore rendered by this Court be set aside and the judgment of the Court of Civil Appeals, reversing the trial court's judgment and remanding the case for a new trial, be affirmed.

Opinion delivered October 20, 1954.

MR. JUSTICE CALVERT, joined by JUSTICES GRIFFIN and WILSON, dissenting.

I dissent from the judgment rendered on motion for rehearing and respectfully enter my protest against the lately developed and developing practice by this court of remanding this type of case to the trial court for retrial without giving the Courts of Civil Appeals an opportunity to decide whether the verdict of the jury or the judgment of the trial court is contrary to the great weight and preponderance of the evidence. The practice is an indirect invasion of the exclusive constitutional jurisdiction of the courts of civil appeals, is not commanded by, but is contrary to, the wording and spirit of the Rules of Civil Procedure, and is a disservice to the administration of justice in that it tends to unnecessary delay in the termination of litigation.

The question usually arises in this fact situation: A court of civil appeals sustains a point of error that there is no evidence of probative force to support a jury verdict or a trial court judgment and, having done so, does not rule on a point of error that the verdict or judgment is contrary to the great weight and preponderance of the evidence. This court then grants a writ of error and upon analyzing the evidence concludes and holds, contrary to the holding of the court of civil appeals, that the verdict or judgment is supported by evidence of probative force. The question then arises: Should we remand the case to the court of civil appeals for its consideration and decision of the point challenging the sufficiency of the evidence or should we remand to the trial court for retrial?

Article V, Section 6 of the Constitution of Texas makes the jurisdiction of the courts of civil appeals exclusive and final on the question of the sufficiency or insufficiency of the evidence to support a jury verdict or a trial court judgment. Under the Constitution it is the solemn duty and exclusive prerogative of the courts of civil appeals to exercise that jurisdiction. In other situations we scrupulously observe that exclusive jurisdiction.

But in the cases cited in the per curiam opinion this court has invaded that jurisdiction through the use of a so-called "presumption" or "assumption" that the court of civil appeals either had decided the question in a particular manner (when there was nothing in the opinion to show that it had), or that it would have so decided it if it had reached it. By whatever name the procedure may be called and by whatever device the result may be reached, it is and can be nothing more than an assumption, and exercise, by this court of jurisdiction to pass on a question of which it has no jurisdiction under the Constitution.

The cited decisions have led us into wholly inconsistent and anomalous positions in the field of procedural law. We have held, consistently, that a point of error that there is "no evidence" to support a jury verdict or trial court judgment does not and cannot "include" a contention that the evidence is "insufficient" to support the verdict or judgment: Hall Music Co. v. Robinson, 117 Texas 261, 1 S.W. 2d 857; Ochoa v. Winerich Motor Sales Co., 127 Texas 542, 94 S.W. 2d 416; Liberty Film Lines v. Porter, 136 Texas 49, 146 S.W. 2d 982; Wisdom v. Smith, 146 Texas 420, 209 S.W. 2d 164; Parker Petroleum Co. v. Laws, 150 Texas 430, 242 S.W. 2d 164; and yet, by the cited cases, we have held that a *ruling* on a "no evidence" point can and does "include" a *ruling* on an "insufficient evidence" point. Moreover, it is well established that a question of "no evidence" is a law question and a question of "insufficient evidence" is a fact question; Choate v. San Antonio & A. P. Ry. Co., 91 Texas 406, 44 S.W. 69; International & G. N. Ry. Co. v. Vallejo, 102 Texas 70, 113 S.W. 4; Electric Express & Baggage Co. v. Ablon, 110 Texas 235, 218 S.W. 1030; Liberty Film Lines v. Porter, supra; Childre v. Casstevens, 148 Texas 297, 224 S.W. 2d 461, and the effect of the cited cases is that when a court of civil appeals has decided only a law question, we will presume or assume that it also decided a fact question.

Rule 503, Texas Rules of Civil Procedure, makes it optional with this court whether the cause is remanded to the court of civil appeals or to the trial court. It provides: "If the judgment of a Court of Civil Appeals shall be reversed, the Supreme Court may remand the case either to the Court of Civil Appeals from which it came or to the district court for another trial. * * *." When read in connection with rules governing courts of civil appeals, however, it is obvious that they are brought into greater harmony by a remand to the court of civil appeals in the instant fact situation. Rule 451 directs that "The Courts of Civil Appeals shall decide all issues presented to them by proper

assignments of error by either party, whether such issues be of fact or of law, and announce in writing their conclusions." Rule 453 provides: "Conclusions of fact and law upon each material point assigned as error in the Court of Civil Appeals shall be made and filed within thirty days after the decision of the case, if the case be one in which the Supreme Court has jurisdiction of an application for writ of error. * * *." Rule 454 provides: "In cases where the judgment of the trial court shall be reversed and the cause remanded the Court of Civil Appeals shall state its reasons for the judgment."

While a court of civil appeals may, and often does, decide both the law question of "no evidence" and the fact question of "insufficient evidence" in its original opinion in a case, it is under no compulsion to decide the fact question if it has held, on the law question, that there is no evidence to support the verdict or judgment. The fact that it may have decided the law question erroneously, however, should not deny to it the right or relieve it of its solemn duty to decide the fact issue and announce its conclusion in writing as required by Rule 451, or to determine if the trial court's judgment should be reversed and the cause remanded because it deems the verdict or judgment to be contrary to the weight and preponderance of the evidence, and thereupon to "state its reasons for its judgment" as required by Rule 454. It has been suggested that having ruled there was no evidence the courts of civil appeals, on remand, would undoubtedly hold the evidence insufficient. I do not deem it so in the light of the fact that cases hereinafter to be cited will show that in numerous such situations they have held, on remand to them of the fact question, that the evidence was sufficient to support the jury's verdict or the court's judgment. But be that as it may, it is no sufficient reason for denying them the right or excusing them from the duty conferred and enjoined on them by the Constitution and the Rules of Civil Procedure. Moreover, if the courts of civil appeals wish to avoid that situation they may do so by deciding both questions in the first instance. On the other hand, they should be permitted, if they prefer, to decide only the law question in the first instance and reserve judgment on the fact question until after this court has acted on the law question.

There is no reason to say that we are bound by the cited decisions to follow the course of the per curiam opinion. It is purely a matter of procedure. Neither vested rights nor property right are involved. Moreover, not all of our decisions have followed the procedure of those cases. Long v. Long, 133 Texas

96, 125 S.W. 2d 1034 is in direct conflict, and others are in conflict at least in part and in spirit. See Henry v. Kirby Lbr. Co., 110 Texas 218, 215 S.W. 451, on rehearing, 218 S.W. 363; Ferguson v. Harris, 137 Texas 592, 156 S.W. 2d 135; Baker v. Baker, 143 Texas 191, 183 S.W. 2d 724. It thus appears that even if we are disposed to be governed by the rule of stare decisis in this purely procedural matter, we have a choice of which line of decisions we will follow.

Lest it be thought that the reasons given above for differing with the majority are of a purely technical character, let us now consider which course would better promote the administration of justice in finally disposing of litigation.

If we remand to the Courts of Civil Appeals those courts will pass directly on the sufficiency of the evidence. If they hold the evidence sufficient, the trial court's judgment will be affirmed and the litigation will be at an end. If they hold the evidence insufficient, the losing party will know that unless he can obtain new or different evidence it would be futile to retry his case, and the litigation, in the normal and usual situation, will be at an end. By remanding to the Courts of Civil Appeals the litigation will thus normally be ended within six months after this court's judgment is entered. On the other hand, if we remand the case to the trial court on our "presumption" that the Court of Civil Appeals would have reversed for insufficiency of the evidence if it had ruled on the point, the parties have no way of knowing whether the presumption is a sound one without seeking a new place for retrial on a crowded trial docket, and wending their tortuous way back to the Court of Civil Appeals a second time. This procedure will require from a year to two or more years to get the case finally disposed of. No matter what the Court of Civil Appeals' ruling on the second appeal, it could have made the same ruling a year or more earlier if we had only afforded it an opportunity.

What has been said about the practical effect of the two courses of procedure is not pure theory or speculation. Its soundness, in fact, is demonstrated in the decided cases. Let us first notice the results in those cases which have been remanded to the courts of civil appeals.

In Kirby Lbr. Co. v. Henry, 178 S.W. 23, the Court of Civil Appeals held that the evidence established contributory negligence as a matter of law and reversed a trial court judgment for the plaintiff and rendered judgment for the defendant. This

court held the ruling of the Court of Civil Appeals to be erroneous, and, on original submission reversed the judgment of the Court of Civil Appeals and affirmed the judgment of the trial court. 110 Texas 218, 215 S.W. 451. On rehearing, the judgment affirming the trial court's judgment was withdrawn and the case was remanded to the Court of Civil Appeals so that it might pass on questions exclusively within its jurisdiction, principally that the evidence was insufficient to support the jury finding that there was no contributory negligence. 218 S.W. 363. Within ten months thereafter the litigation was terminated by a holding of the Court of Civil Appeals (contrary to the presumption we are want to indulge) that the evidence was sufficient to support the verdict. 224 S.W. 814.

In Ferguson v. Harris, 135 S.W. 2d 595, the Court of Civil Appeals held that a vital fact issue was established by the evidence as a matter of law and reversed a trial court judgment, but because of errors in the charge remanded the case for retrial. This court disagreed with the Court of Civil Appeals' holding that the fact was established as a matter of law and remanded the case to the Court of Civil Appeals to permit it to pass on an assignment attacking the sufficiency of the evidence to support the fact finding. 137 Texas 592, 156 S.W. 2d 135. Within three months the litigation had been finally terminated by a holding by the Court of Civil Appeals (contrary to the presumption so frequently indulged by this court) that the evidence was sufficient to sustain the verdict. 159 S.W. 2d 950.

In Baker v. Baker, 169 S.W. 2d 1016, the Court of Civil Appeals held there was no evidence to sustain certain jury findings and reversed and rendered. This court held that holding to be erroneous but instead of remanding to the trial court upon a presumption that the Court of Civil Appeals had also held the evidence insufficient, remanded the case to the Court of Civil Appeals with instructions to pass on the insufficiency assignment. 143 Texas 191, 183 S.W. 2d 724. This the Court of Civil Appeals did within six months and sustained the assignment. 188 S.W. 2nd 733. The case was relitigated but upon a somewhat different theory. 207 S.W. 2d 244.

In Long v. Long, 98 S.W. 2d 236, the Court of Civil Appeals held there was no evidence to support the jury's verdict of undue influence. It did not pass on an assignment that the evidence was insufficient to support the jury's verdict. This court reversed the judgment of the Court of Civil Appeals but remanded to that court to pass on the insufficiency assignment.

133 Texas 96, 125 S.W. 2d 1034. The Court of Civil Appeals then held the evidence was sufficient to support the jury's verdict and affirmed the judgment of the trial court. 129 S.W. 2d 1206, writ of error dismissed, 133 Texas 623, 138 S.W. 2d 798. Thus the litigation was ended, to all intents and purposes, within four months after this court had ruled on the no evidence question. What is more, the ruling of the Court of Civil Appeals on the sufficiency question was exactly contrary to what we would have presumed it to be if we had followed the course adopted by the majority in this case.

Now let us examine the history of Lowry v. Anderson-Berney Bldg. Co., cited in the majority opinion. The Court of Civil Appeals held there was no evidence to support a jury finding that the plaintiff was injured in the course of his employment and reversed and rendered. 143 S.W. 2d 401. This court disagreed with that holding and reversed the judgment of the Court of Civil Appeals, but, indulging the presumption that the Court of Civil Appeals would also have held the evidence insufficient to support the finding, remanded to the trial court. 139 Texas 29, 161 S.W. 2nd 459. The case was retried and reached the Court of Civil Appeals again nearly two years after this court had remanded to the trial court. On the second appeal the Court of Civil Appeals overruled an assignment attacking the sufficiency of the evidence even though it found the "testimony on this trial is substantially the same as it was on the former trial." 177 S.W. 2d 984, 985. The ruling was exactly contrary to the presumption this court had indulged on the first appeal. Moreover, if the Court of Civil Appeals had been permitted to exercise its exclusive jurisdiction on the first appeal the litigation would have been terminated two years earlier and a second trial and appeal, with their added expense to the litigants, would have been unnecessary.

Texas Ind. Ins. Co. v. Halliburton has a similar history. In that case the Court of Civil Appeals held there was no evidence to support a jury finding that the injured plaintiff was an employee of the insured. 209 S.W. 2d 775. This court ruled that holding erroneous, but, indulging the presumption that the Court of Civil Appeals would also have held the evidence insufficient, remanded the case to the trial court. 147 Texas 133, 213 S.W. 2d 677. The case was retried and reached the Court of Civil Appeals again more than two years later. That court then overruled an assignment attacking the sufficiency of the evidence (directly contrary to what this court had theretofore presumed it would do) and affirmed the trial court's judgment. 235 S.W.

2d 499. But it took two years, a second trial and a second appeal for the parties to obtain a holding that might well have been made within two months if the case had been remanded to the Court of Civil Appeals in the first instance.

Turning now to the record in this case, it appears that respondent's right to reform for mutual mistake was based upon an alleged agreement that the disputed strip was not to be conveyed. The jury found no such agreement was made and judgment was rendered for petitioner. The Court of Civil Appeals reversed and remanded for lack of necessary parties. In the course of its opinion that court had occasion to say that "the evidence was sufficient to establish as a matter of law that such mutual mistake occurred." Quite obviously, however, the main law question dealt with by the court was whether the nature of respondent's suit was one to reform the deed in question or one to establish and enforce an equitable title. This court regarded the issue of mutual mistake as the controlling issue in the case, and in the opinion of the court Justice Griffin made an exhaustive analysis of the evidence to demonstrate that the evidence did not establish mutual mistake as a matter of law. The question of the sufficiency of the evidence to sustain the finding that the alleged agreement was not made has not been decided by the Court of Civil Appeals and, under the Constitution, cannot be decided by this court. It is therefore my opinion that we should not decide the question by indirection but should remand the case to the Court of Civil Appeals that it may exercise its exclusive jurisdiction to decide it. If in the light of our analysis of the evidence and its mature consideration thereof the Court of Civil Appeals should conclude that the jury verdict is contrary to the great weight and preponderance of the evidence, it should have no hesitancy in reversing the judgment and remanding the case for retrial. If it should reach the opposite conclusion, it should affirm. In either event what we have said on the law question of "no evidence" should be no impediment and no source of embarrassment to the Court of Civil Appeals' own proper evaluation of the evidence on the fact question of "insufficient evidence" because that court and that court alone is made the final arbiter of that question.

The specific prayer of the respondent in its motion for rehearing is that this case be remanded to the Court of Civil Appeals so that court may pass on its point of error challenging the sufficiency of the evidence. That prayer ought to be granted. The respondent should not be put to the time and expense of trying its case again with the possibility that a jury will again make the same finding and the Court of Civil Appeals will uphold

that finding as having sufficient support in the evidence. In the absence of new evidence the rights of the parties on the question involved can be determined now by a remand to the Court of Civil Appeals. In my opinion, for the reasons given, the case should be so remanded.

Opinion delivered October 20, 1954.